**Exhibit A**

3/30/17 @3PM

COPY

**SUM-100**

## SUMMONS
### (CITACIÓN JUDICIAL)

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
FCA US LLC, a Delaware Limited Liability Company; TULARE SAG, INC., a California Corporation dba LAMPE CHRYSLER DODGE JEEP RAM; and DOES 1 through 10, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**

IGNACIO RAMOS and ELIZABETH RAMOS aka ELIZABETH RAMOS-IBARRA

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
(El nombre y dirección de la corte es):
County Civic Center
221 South Mooney Boulevard
Visalia, CA 93291

**CASE NUMBER:**
(Número del Caso):
**269091**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Knight Law Group, LLP
1801 Century Park East, Suite 2300, Los Angeles, CA 90067
(310) 552-2250

DATE: MAR 2 8 2017   LaRayne Cleex   Clerk, by _____ , Deputy
(Fecha)   (Secretario)   (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):

3. ☐ on behalf of (specify): FCA US LLC, a Delaware Limited Liability Company

under: ☐ CCP 416.10 (corporation)   ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
☐ other (specify): Corporation Code 17061 (Limited Liability Company)
4. ☐ by personal delivery on (date):

[COURT SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

Page 1 of 1

American LegalNet, Inc.
www.FormsWorkflow.com

BRET D. HILLMAN

For All Purposes

**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
Lauren A. Ungs (SBN 273374)
1801 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiffs,
IGNACIO RAMOS and
ELIZABETH RAMOS aka
ELIZABETH RAMOS-IBARRA

**FILED**
TULARE COUNTY SUPERIOR COURT
VISALIA DIVISION.

**MAR 28 2017**

LARAYNE CLEEK, CLERK
BY _____

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF TULARE

**269091**

| | |
|---|---|
| IGNACIO RAMOS and ELIZABETH RAMOS aka ELIZABETH RAMOS-IBARRA,<br><br>Plaintiffs,<br><br>vs.<br><br>FCA US LLC, a Delaware Limited Liability Company; TULARE SAG, INC., a California Corporation dba LAMPE CHRYSLER DODGE JEEP RAM; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:<br><br>Unlimited Jurisdiction<br><br>**COMPLAINT**<br><br>1. **BREACH OF EXPRESS WARRANTY – VIOLATION OF SONG-BEVERLY ACT**<br>2. **BREACH OF IMPLIED WARRANTY – VIOLATION OF SONG-BEVERLY ACT**<br>3. **FRAUDULENT INDUCEMENT – CONCEALMENT**<br><br>**BY FAX**<br>CASE MANAGEMENT CONFERENCE<br><br>Hearing Date: ___9-3-17___<br>Time: ___8:30a-m___<br>Department: ___7___ |

-1-

Ramos v. FCA US LLC – COMPLAINT

1  Plaintiffs, IGNACIO RAMOS and ELIZABETH RAMOS aka ELIZABETH RAMOS-
2  IBARRA, allege as follows against Defendants, FCA US LLC, a Delaware Limited Liability
3  Company, ("FCA US LLC"), TULARE SAG, INC., a California Corporation dba LAMPE
4  CHRYSLER DODGE JEEP RAM ("LAMPE CHRYSLER"), and DOES 1 through 10 inclusive,
5  on information and belief, formed after an inquiry reasonable under the circumstances:

6

7  ### DEMAND FOR JURY TRIAL

8  · 1.  Plaintiffs, IGNACIO RAMOS and ELIZABETH RAMOS aka ELIZABETH RAMOS-
9  IBARRA, ("Plaintiffs"), hereby demand trial by jury in this action.

10

11  ### GENERAL ALLEGATIONS

12  2.  Plainitffs are individuals residing in the City of Dinuba, County of Tulare, and State of
13  California.

14  3.  Defendant FCA US LLC is and at all relevant times was a Delaware Limited Liability
15  Company registered to do business in the State of California with its registered office in the City of
16  Los Angeles, County of Los Angeles, and State of California.

17  4.  Defendant LAMPE CHRYSLER is and at all relevant times was a California Corporation
18  registered to do business in the State of California with its principal place of business in the City of
19  Visalia, County of Tulare, and State of California

20  5.  This cause of action arises out of the warranty obligations of FCA US LLC for a vehicle
21  purchased by Plaintiffs from FCA US LLC through LAMPE CHRYSLER and for which FCA US
22  LLC issued a written warranty.

23  6.  Plaintiffs do not know the true names and capacities, whether corporate, partnership,
24  associate, individual or otherwise of Defendant issued herein as Does 1 through 10, inclusive,
25  under the provisions of section 474 of the California Code of Civil Procedure. Defendant Does 1
26  through 10, inclusive, are in some manner responsible for the acts, occurrences and transactions set
27  forth herein, and are legally liable to Plaintiffs. Plaintiffs will seek leave to amend this Complaint
28  to set forth the true names and capacities of the fictitiously named Defendant, together with

1  appropriate charging allegations, when ascertained.

2  7. All acts of corporate employees as alleged were authorized or ratified by an officer,
3  director or managing agent of the corporate employer.

4  8. Each Defendant whether actually or fictitiously named herein, was the principal, agent
5  (actual or ostensible), or employee of each other Defendant and in acting as such principal or
6  within the course and scope of such employment or agency, took some part in the acts and
7  omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiffs for the
8  relief prayed for herein.

9  9. On May 5, 2013, Plaintiffs purchased a new 2013 Dodge Truck Ram 1500, VIN:
10  1C6RR6KTXDS507710, ("the Subject Vehicle"). The sales contract is attached and incorporated
11  by its reference as Exhibit 1.

12  10. The Subject Vehicle was delivered to Plaintiffs with serious defects and nonconformities
13  to warranty and developed other serious defects and nonconformities to warranty including, but
14  not limited to transmission, electrical, suspension, and engine defects.

15  11. Plaintiffs hereby revokes acceptance of the sales contract.

16  12. Plainitffs hereby demand trial by jury in this action.

17

18  **The Totally Integrated Power Module (TIPM) Defect**

19  13. The Subject Vehicle was factory-equipped with a Totally Integrated Power Module
20  ("TIPM") which is located under the hood in the vehicle engine compartment. FCA US LLC
21  equipped the Subject Vehicle with a TIPM that FCA US LLC refers to as the "TIPM 7."

22  14. The TIPM is the chief component in the Subject Vehicle's power distribution systems and
23  consists of a computer, relays, fuses, and controls. The TIPM provides the primary means of
24  voltage distribution and protection for the entire vehicle and FCA US LLC acknowledges that the
25  TIPM is intended to provide safe, reliable, and centralized distribution of power to the Subject
26  Vehicle's electrical systems.

27  15. The electrical systems that receive power distributed by the TIPM include the vehicles'
28  safety systems, security system, ignition system, fuel system, electrical powertrain, and the

1  vehicles' comfort and convenience systems. These systems control components including the air
2  bags, fuel pump, windshield wipers, headlights, taillights, turn signals, and power windows and
3  doors.

4      16. The TIPM installed in the Subject Vehicle is defective and thus fails to reliably control and
5  distribute power to various vehicle electrical systems and component parts.

6      17. As a result of the TIPM defect, the Subject Vehicle has made irregular rattling and buzzing
7  noises.

8      18. The TIPM in the Subject Vehicle is likely to cause a variety of electrical issues such as a
9  loss of headlight function, and unexpected distractions, such as the vehicle's horn or alarm
10  sounding while on a roadway, which may each increase the risk of injury for the driver,
11  passengers, or others on the roadway.  The defective TIPM imposes a substantial safety risk to the
12  operator of the vehicle and surrounding drivers.

13      19. FCA US LLC has instructed employees in multiple divisions to investigate the TIPM
14  defect. As recently as spring 2012, teams were investigating vehicles equipped with the TIPM-7
15  not starting, having difficulty starting, and stalling, attributed to a malfunctioning fuel pump relay
16  integral to the TIPM printed circuit board.

17

18                    **FCA US LLC's Knowledge of the TIPM Defect**

19      20. FCA US LLC had superior and exclusive knowledge of the TIPM defects, and knew or
20  should have known that the defects were not known by or reasonably discoverable by Plaintiffs
21  before Plaintiffs purchased or leased the Subject Vehicle.

22      21. FCA US LLC's knowledge of the TIPM-7 defects since at least 2007 is demonstrated by
23  the numerous consumer complaints submitted to FCA US LLC and to NHTSA, multiple TIPM-
24  related recalls and technical service bulletins, two NHTSA investigations into TIPM-related
25  complaints, FCA US LLC's exhaustive pre-release vehicle testing, and FCA US LLC's exclusive
26  access to post-sale data about the performance of and repairs made to its vehicles.  The use of
27  limited recalls and TSBs as stop-gap measures demonstrates a pattern of concealment and
28  improper denial of the TIPM defect by FCA US LLC.

22. FCA US LLC vehicles have been plagued with severe TIPM problems for the past decade. As a result, FCA US LLC has initiated multiple TIPM-related recalls to address safety or emissions concerns.

23. An automotive manufacturer service bulletin typically takes time to develop and issue because the manufacturer needs to identify and understand the problem, develop and test the new repair instructions, and draft and finalize the bulletin before distributing it to dealerships.

24. The defect is so widespread that TIPM 7 replacement parts have often been on national backorder, with drivers reporting from 2011 to 2014 that they had to wait weeks or months to have their TIPMs replaced. In the meantime, FCA US LLC dealerships and auto-technicians are advising many drivers not to drive their vehicles until the TIPM is replaced, due to safety risks.

### NHTSA Recall 05V-461

### (Defective TIPM-6 Causing Vehicles to Roll Away Without Warning)

25. In October 2005, FCA US LLC recalled model year ("MY") 2006 Dodge Ram 1500 4x4 vehicles to reprogram (i.e., "flash") the TIPM-6 with new software to cure a safety-related defect.

26. The defect was that the TIPM-6 could have incorrect transfer case calibration set points. As a consequence, the transfer case could shift into neutral without warning and, if the parking brake were not engaged, the vehicle could roll away.

27. FCA US LLC admitted that because of the defect, "the vehicle could roll away with the transmission in the Park position and cause a crash without warning."

28. This defect shows that FCA US LLC was aware of the dangerous, life-threatening consequences of a defective TIPM. Yet, despite this knowledge, FCA US LLC manufactured the next generation TIPM, the TIMP-7, without resolving the module's propensity to cause life-threatening crashes.

///

///

///

///

1  *NHTSA Investigation PE07-027 / NHTSA Recall 07V-291*

2  *(Defective TIPM Causing Engine Stalling)*

3  29. In May 2007, NHTSA's Office of Defect Investigation ("ODI") opened Preliminary
4  Evaluation PE07-027.

5  30. The ODI had received 53 consumer complaints alleging incidents of engine stalling in MY
6  2007 Jeep Wrangler vehicles, prompting the evaluation. Most of the stalls occurred suddenly, and
7  in 12 of them a loss of electrical power causing a loss of vehicle lighting coincided with the stalls.

8  31. The purpose of NHTSA's evaluation was to assess the frequency, scope, and safety
9  consequences of the defect in the subject vehicles.

10  32. The ODI agreed to close the evaluation when, on July 3, 2007, FCA US LLC agreed to
11  recall approximately 80,894 MY 2007 Jeep Wrangler and MY 2007 Dodge Nitro vehicles
12  (NHTSA Recall 07V-291).

13  33. To remedy the stalling problem, FCA US LLC agreed to reprogram the TIPM in the
14  subject vehicles with revised software. FCA US LLC admitted that there was an "issue" with the
15  TIPM "that could result in an engine stall while driving," which could "cause a crash without
16  warning."

17  34. At the time the evaluation as closed, the ODI had received 230 consumer complaints, two
18  of which involved crashes and injuries. FCA US LLC had directly received 279 complaints by this
19  time.

20  35. This recall did not cure all of the TIPM defects in the 2007 Dodge Nitro, as demonstrated
21  by the fact that the 2007 Dodge Nitro was recalled again in November 2009 for a safety defect
22  concerning TIPM-related windshield wiper problems.

23  36. Because the same TIPM was installed in the MY 2007 Dodge Nitro as in the Vehicle, this
24  recall demonstrates FCA US LLC's knowledge of the defective TIPM in the Vehicle.

25  37. This recall did not resolve the stalling problems caused by the faulty TIPM, as
26  demonstrated by a consumer complaint submitted to NHTSA on February 7, 2008 in which the
27  complainant describes stalling in a MY 2007 Jeep Wrangler *after* having the recall repairs, and
28  subsequently being told by a dealership service manager that the TIPM had to be replaced to cure

1   the stalling problem (NHTSA ID No. 10217364, included in its entirety below.)

2

3                      *Emissions Recall 2007-15-E (G23)*

4                *(Drivability Concerns Resulting from TIPM-7)*

5        38. In June 2007, FCA US LLC released an emission recall on certain vehicles equipped with

6   the TIPM-7. The recall was conducted to reprogram the vehicles' TIPM to prevent a condition

7   where during some trips the vehicles would have only a single forward gear ratio available. FCA

8   US LLC admitted that "[b]oth emissions and drivability would be affected when vehicle is stick in

9   one forward gear."

10

11                    *Technical Service Bulletin 08-018-08*

12              *(Defective TIPM Causing Inability to Record Data)*

13       39. In May 2008, FCA US LLC distributed TSB 08-018-08 to its nationwide network of

14  authorized dealers and service providers.

15       40. This TSB is not publicly available, either in summary form or in its entirety, because

16  neither FCA US LLC nor NHTSA classified the TIPM defect addressed in the TSB as a *safety*

17  *defect.*

18       41. The TSB covered several 2008 MY vehicles equipped with a TIPM-7.

19       42. The TIPM defect purportedly resolved by this TSB involved data recording – specifically,

20  the inability to record data because of TIPM software problems.

21       43. The TSB states that "[d]ata recording is a valuable tool that provides assistance in

22  diagnosing difficult to duplicate customer concerns. Some of the[se] models... were incapable of

23  utilizing the data recording features due to software compatibility concerns within the TIPM." In

24  other words, FCA US LLC admitted internally that owners and lessees of these vehicles would

25  suffer mechanical problems with their vehicles, take the vehicles in for repair, and be told that the

26  onboard computer did not show that any mechanical "event" or "problem" had occurred. Any

27  reasonable consumer who has taken her car in for repairs would view this as a maddening scenario.

28  ///

1    44. It is troubling that this TIPM defect has not been classified as a safety defect. Although the

2    failure to record data itself does not appear to cause a loss of vehicle control and is probably

3    unnoticed by the driver, the failure to record real-time data could fail to record the manifestation of

4    a safety defect, such as stalling, that would present a life-threatening safety hazard. FCA US

5    LLC's, as well as consumers', ability to detect the manifestation of a safety defect was severely

6    compromised by the inability to record data caused by the defective TIPM.

7    45. Because the TIPM installed in these vehicles is the same as in the Vehicle, FCA US LLC

8    was aware – yet again – that the TIPM installed in the Vehicle was defective, and chose a stop-gap

9    remedy on a limited set of vehicles.

10   46. Because the TSB was not publicly available, owners and lessees of these vehicles were

11   unaware of the issue and many of them likely did not obtain the TIPM repair described in the TSB.

12   47. By proceeding with a non-public TSB instead of a publicly-announced safety recall, FCA

13   US LLC chose to remain willfully blind about the manifestation of safety defects that a properly

14   functioning TIPM would have enabled the data recorder to record.

15   48. Rather than disclose the TIPM problem and offer an adequate solution, FCA US LLC

16   attempted to conceal it by advising its network of authorized dealers and service providers to

17   update and/or flash the TIPM instead of replacing it.

18

19   *NHTSA Recall 09V-438*

20   *(Defective TIPM Windshield Wiper Relays Increasing Risk of a Crash)*

21   49. In November 2009, FCA US LLC notified NHTSA of a safety defect affecting the

22   windshield wiper system on certain vehicles equipped with the TIPM-7.

23   50. The TIPM was defective in that a relay controlling the wipers could short out, causing the

24   wipers to fail, in turn causing impaired driver visibility increasing the risk of a crash.

25   51. FCA US LLC recalled 84,680 vehicles to reprogram the TIPM.

26   52. Because the TIPM in the vehicles subject to this recall and in the Vehicle is the same, this

27   recall demonstrates that FCA US LLC knew, at the time that Plaintiffs purchased or leased the

28   Vehicle, that the TIPM was defective.

1

2
*Technical Service Bulletin 08-053-11*

3
*(Defective TIPM Causing Failure to Start and Intermittent Alarm Sound)*

4
53. In August 2011, FCA US LLC distributed TSB 08-053-11 to its nationwide network of

5
authorized dealers and service providers.

6
54. This TSB is not publicly available, either in summary form or in its entirety, because

7
neither FCA US LLC nor NHTSA have classified the TIPM defect addressed in the TSB as a

8
safety defect.

9
55. This TSB covered numerous vehicles equipped with the TIPM-7.

10
56. The TIPM was defective in that the vehicle theft alarm would intermittently sound for no

11
apparent reason and the vehicles would fail to start.

12
57. The TSB's purported fix was to flash reprogram the TIPM with new software.

13
58. It is troubling that this TIPM defect has not been classified as a safety defect. If a vehicle

14
alarm sounds during regular operation of the vehicle, it could be so jarring and distracting as to

15
cause the driver to lose control of the vehicle. Once again, FCA US LLC chose to address this

16
problem internally rather than conduct a safety recall which would have alerted its customers,

17
NHTSA, and the public to the ongoing, repeated safety problems with the TIPM.

18
59. Because the TIPM installed in these vehicles is the same as in the Vehicle, FCA US LLC

19
was aware—once again—that the TIPM installed in the Subject Vehicle was defective, and again

20
chose an inadequate stop-gap remedy on a limited set of vehicles.

21
60. Rather than disclose the TIPM problem and offer an adequate solution, FCA US LLC

22
attempted to conceal it by advising its network of authorized dealers and service providers to

23
update and/or flash the TIPM instead of replacing it.

24

25
*NHTSA Recall 13V-282*

26
*(Defective TIPM Causing Non-Deployment of Active Head Restraints)*

27
61. In July 2013, FCA US LLC initiated yet another TIPM-related safety recall. FCA US LLC

28
notified NHTSA that the airbag warning lamp would incorrectly illuminate due to an electrical

-9-

1   overstress condition within the Occupant Restraint Controller Module ("ORCM"), which would in

2   turn cause the active head restraints to not deploy in certain rear-impact collisions, thereby

3   increasing the risk of injury to a front seat occupant.

4       62. FCA US LLC recalled approximately 442,481 vehicles to flash the TIPM or replace the

5   ORCM, as required. The TIPM was flash reprogrammed in certain vehicles equipped with the

6   TIPM-7.

7       63. Once again, this recall evidences FCA US LLC's knowledge of the defective TIPM and

8   shows FCA US LLC's repeated attempts to employ inadequate piecemeal remedies on the Subject

9   Vehicle.

10

11              *Center for Auto Safety Submits Defect Petition to NHTSA*

12      64. On August 21, 2014, the Center for Auto Safety ("CAS") submitted a defect petition to

13  NHTSA, requesting that NHTSA "initiate a safety defect investigation into failures associated with

14  the [TIPM] installed in FCA US LLC SUVs, trucks, and vans beginning in the 2007 model year."

15  The petition noted that TIPM failures result in a variety of safety-related problems, "many of

16  which have the potential for destructive results," such as stalling, airbag non-deployment, failure

17  of fuel-pump shutoff, and vehicle fires.

18      65. CAS had received at least 70 complaints related to the TIPM in FCA US LLC vehicles, and

19  a stall/no-start condition was the most reported outcome of TIPM failure. Seventeen of these

20  complaints report engine stalling and 34 report a failure to start. Two of them report smoke and

21  one reports a vehicle fire.

22      66. The CAS petition asserts that FCA US LLC's previous TIPM-related recalls were

23  insufficient "to address the TIPM problem widespread throughout FCA US LLC's fleet, instead

24  focusing on a highly limited set of vehicles and circumstances."

25      67. Plaintiffs have  suffered the consequences of the TIPM failure described by CAS, and

26  Plaintiffs agrees with CAS's characterization of the TIPM problem as widespread throughout FCA

27  US LLC's fleet and in the Vehicle.

28

*NHTSA Recall 14V-530*

<u>*(Failure of Fuel Pump Relay Within the TIPM)*</u>

68. On September 3, 2014, FCA US LLC notified NHTSA of yet another TIPM-related safety defect. This time, the fuel pump relay within the TIPM could fail, causing stalling without warning or failure to start. In FCA US LLC's words, "[t]he vehicle may intermittently or permanently: not start, not start the first time, not stay running upon start, stall, or the fuel pump may stay energized upon vehicle shutdown," and "[a]n intermittent or failed fuel pump relay could cause the engine to stall while driving and cause a crash without a warning."

69. The remedy under the recall was to install a new fuel pump relay external to the TIPM. FCA US LLC may have decided that resolving the problem within the TIPM was not feasible, given the extensive defects and problems within the TIPM.

70. The recall covered 188,723 vehicles equipped with the TIPM-7.

71. Yet again, this recall demonstrates FCA US LLC's knowledge that the TIPM in the Subject Vehicle was defective. And again, FCA US LLC chose to implement an inadequate piecemeal remedy.

<u>*NHTSA Agrees to Evaluate the CAS Defect Petition*</u>

72. On September 8, 2014, the CAS supplemented its defect petition with additional consumer complaints about the TIPM. In the supplement, the CAS identified 24 crashes from NHTSA's Early Warning Reporting ("EWR") database that the CAS believes may be related to TIPM failure. Crash reports in the EWR database are submitted by the vehicle manufacturer, demonstrating FCA US LLC's awareness of these crashes.

73. On September 25, 2014, NHTSA's ODI opened Investigation DP14-004 to evaluate the CAS's defect petition. The investigation will "review allegations of [TIPM] failures resulting in engine stall while driving, airbag non-deployment incidents, unintended acceleration and/or vehicle fire in certain . . . vehicles . . . equipped with TIPM-7 modules and manufactured by FCA US LLC Group LLC[.]"

///

1    74. The ODI investigation covers approximately 4,800,000 vehicles equipped with the TIPM-
2    7.

3    75. On September 30, 2014, the CAS submitted another supplement to its defect petition,
4    including approximately 25 new consumer complaints about the TIPM that it had received.

5    76. With CAS's submission of its defect petition and supplements, and NHTSA's opening of
6    the investigation, FCA US LLC is aware of all of the TIPM-related complaints made to the CAS.
7    This is in addition to all of the TIPM-related complaints made to NHTSA about which FCA US
8    LLC is, and has been, aware. At the very least, FCA US LLC has constructive knowledge of the
9    consumer complaints submitted to NHTSA, which are publically available on the NHTSA website.

10    77. In response to a request for information by NHTSA, FCA US LLC stated the following in a
11    December 12, 2014 letter to NHTSA:

12        a. FCA US LLC had identified 709 reports which relate or may relate to the TIPM in
13           the subject vehicles, representing 199 unique vehicle identification numbers
14           ("VINs").

15        b. FCA US LLC had identified 605 consumer complaints, made to FCA US LLC,
16           which relate or may related to the TIPM in the subject vehicles, representing 189
17           unique VINs. FCA US LLC did not specify when it received these complaints.

18        c. FCA US LLC had identified 104 Field Reports which relate or may relate to the
19           TIPM in the subject vehicles, representing 65 unique VINs. FCA US LLC did not
20           specify when it performed these field reports.

21        d. FCA US LLC had identified 207 paid warranty claims related to repair or
22           replacement of the TIPM-7 module, representing 126 unique VINs.

23    78. In 2013, FCA US LLC conducted a safety recall of 2011 and 2012 model year Dodge Nitro
24    and Jeep Liberty vehicles, through which it would "flash" the vehicles' TIPM. The recall was
25    prompted by the fact that the vehicles could experience illuminated airbag warning lamps and
26    restraints not deploying in collisions.

27    79. In that letter, FCA US LLC stated also that it had identified zero reports of crash, fire,
28    injury, or fatality which relates or may relate to the TIPM in the subject vehicles. However, by the

1    date of that letter consumers had submitted to NHTSA at least six reports describing crashes or

2    fires in the relevant vehicles, rendering FCA US LLC's statement erroneous if not intentionally

3    misrepresentative:

4           a.  On September 7, 2013, a consumer reported that "the TIPM fuse exploded" in a

5               MY 2011 Jeep Grand Cherokee (NHTSA ID No. 10542447).

6           b.  On March 19, 2014, a consumer reported that the "wires and TIPM started melting

7               and smoking and burned" in a MY 2012 Dodge Ram 5500 (NHTSA ID No.

8               10573426).

9           c.  On March 19, 2014, a consumer reported that the TIPM in a MY 2012 Dodge Ram

10              5500 had caught fire for the second time in a week and that the consumer had taken

11              the truck to a dealership after the first fire (NHTSA ID No. 10573471).

12          d.  On June 5, 2014, a consumer reported that a five-car pileup occurred immediately

13              behind her because she stalled in the middle of the road due to a faulty TIPM in a

14              MY 2011 Dodge Durango (NHTSA ID No. 10596370).

15          e.  On September 18, 2014, a consumer reported that her MY 2011 Durango was

16              "smoking" and that a dealership diagnosed the problem as an electrical short in the

17              TIPM (NHTSA ID No. 10637171).

18          f.  On October 30, 2014, a consumer reported a crash caused by a stall in a MY 2008

19              Jeep Wrangler (NHTSA ID No. 10651411).

20

21                               *Consumer Complaints to NHTSA*

22       80. FCA US LLC has knowledge of the fact that the defective TIPMs installed in the Vehicle is

23    prone to sudden failure because of the numerous complaints that consumers have made to NHTSA.

24       81. Owners of vehicles equipped with a TIPM-7 have submitted at least 240 complaints to

25    NHTSA about electrical problems including stalling, headlights turning off, and failure to start—

26    most, if not all, of which occurred with no warning whatsoever to the driver.

27       82. By the end of 2011, consumers had submitted over 100 complaints about the TIPM to

28    NHTSA.

1      83. Some of these complaints describe dangerous situations, indicating that FCA US LLC is

2  putting the lives of consumers and their passengers at risk. When a defective TIPM suddenly fails

3  without warning, a driver loses the ability to safely operate their vehicle.

4      84. Many of the complaints to NHTSA were made prior to the sale of the Vehicle to Plaintiff.

5      85. For years, FCA US LLC has monitored drivers' safety-related reports to the NHTSA,

6  which can be viewed on the NHTSA's website. There are several hundred complaints on the

7  NHTSA website and elsewhere online dating back to when the TIPM 7 was first introduced in

8  2007 model year FCA US LLC vehicles.

9      86. As early as 2008, drivers of vehicles equipped with the TIPM 7 started contacting the

10  NHTSA to complain that their vehicles were experiencing a host of electrical issues, including

11  uncontrollable activity of the windshield wipers, horn, and alarm system, and the headlights and

12  taillights not working. Drivers also complained that their vehicles would not start and that the

13  vehicles would stall without warning. By the end of 2011, over 100 drivers had complained to the

14  NHTSA that they had experienced some combination of these symptoms, and dealers were

15  diagnosing the problems as stemming from a defective TIPM, with some dealers saying the TIPM

16  was already on a nationwide backorder.

17

18                      *Pre-Release Testing Data*

19      87. FCA US LLC's knowledge of the TIPM defect is also demonstrated by the fact that FCA

20  US LLC studied and tracked TIPM-related issues through exhaustive pre-release testing. In recent

21  years, FCA US LLC has tested models for millions of miles before their release. For example,

22  FCA US LLC employees put seven million miles on multiple 2011 Jeep Grand Cherokee test

23  vehicles before production. Given the speed and frequency with which the TIPM defect manifests,

24  it is not plausible that this testing would not have alerted FCA US LLC to the existence of the

25  TIPM defect. Only FCA US LLC, however, has access to its pre-release testing data.

26      88. FCA US LLC also receives data about how its vehicles are performing in the days, weeks,

27  and months after they are sold. FCA US LLC collects information from both drivers and

28  dealerships, including through complaints, warranty claims, replacement parts data, and other

1 │ aggregated data sources. FCA US LLC has exclusive access to this information also.

2 │ 89. FCA US LLC is collecting old TIPM parts that have been replaced, in an effort to keep
3 │ those parts away from public scrutiny. FCA US LLC is requiring anyone who wants to purchase a
4 │ new TIPM from FCA US LLC to agree to return to FCA US LLC the old TIPM that is being
5 │ replaced. This requirement affects non-FCA US LLC mechanics and private individuals who seek
6 │ to keep the original TIPM parts for any reason, including but not limited to examining those parts
7 │ for defects. In addition, the owners of these vehicles already have paid for the original TIPM parts,
8 │ and should not have to give up their personal property in order to buy a replacement part; this
9 │ amounts to an abusive tactic.

10 │ 90. Notwithstanding the history of TIPM problems in its vehicles, FCA US LLC chose to begin
11 │ installing the TIPM 7 in 2007 model year vehicles and continued to install the TIPM 7 into
12 │ vehicles through the 2014 model year.

13 │ 91. Given the repeated, severe problems that plagued the TIPM in its vehicles, FCA US LLC
14 │ understood that the TIPMs posed a heightened risk of problems for consumers and FCA US LLC
15 │ was particularly aware of and on the lookout for early indicia of TIPM problems.

16 │

17 │ **FCA US LLC's Failure to Disclose the TIPM Defect**

18 │ 92. FCA US LLC has never disclosed the TIPM defect to Plaintiffs prior to the purchase of the
19 │ Subject Vehicle or at any point during ownership of the Subject Vehicle, and FCA US LLC has
20 │ never instructed its dealerships to disclose the TIPM defect to drivers or potential purchasers or
21 │ lessees of vehicles equipped with the TIPM-7.

22 │ 93. The TIPM defect was not known or reasonably discoverable by the Plaintiffs before
23 │ purchase or lease, or without experiencing the defect first hand and exposing themselves to an
24 │ unreasonable safety risk.

25 │ 94. FCA US LLC has remained silent even as it issued a service bulletin, conducted internal
26 │ investigations, and saw the TIPM replacement parts go on national backorder and hundreds of
27 │ complaints for effected vehicles were lodged with the NHTSA.

28 │ ///

1    95. FCA US LLC's refusal to publically acknowledge the defect has created widespread
2  confusion. FCA US LLC's failure to notify consumers, dealerships, or auto-technicians prevents
3  the TIPM problem from being efficiently diagnosed. Drivers often do not realize that the
4  symptoms they are experiencing are due to the TIPM defect or that prompt action is needed to
5  ensure they do not experience stalling, headlight loss, or other dangerous symptoms in the future.
6  Likewise, the lack of information makes it less likely that dealerships and auto-technicians will be
7  able to diagnose and fix the TIPM defect, or advise Plaintiffs about the dangers of driving the
8  Subject Vehicle.

9    96. As a result of FCA US LLC's inaction and silence, Plaintiffs were entirely unaware that
10  Plaintiffs purchased, and continues to drive, unsafe and unreliable vehicles. As FCA US LLC
11  knows, a reasonable person would consider the TIPM defect important and would not purchase or
12  lease a vehicle equipped with the TIPM defect were the defect disclosed in advance, or would pay
13  substantially less for the vehicle.

14
15                          **PLAINTIFFS' EXPERIENCES**

16    97. On or around January 13, 2015, Plaintiffs delivered the Subject Vehicle to an authorized
17  FCA US LLC repair facility for repair. Plaintiffs complained of a rattling noise from the engine.
18  The repair facility technicians replaced the gasket and installed a manifold. The Subject Vehicle
19  was returned to Plaintiffs, and the service manager at the authorized repair facility notified
20  Plaintiffs that the Subject Vehicle was operating normally and was safe to drive.   Plaintiffs
21  reasonably relied on this representation by the manager of the expert repair technicians.

22    98. On or around February 23, 2015, Plaintiffs again delivered the Subject Vehicle to an
23  authorized FCA US LLC repair facility for repair because of a continued rattling noise from the
24  engine. The repair facility technicians replaced the nuts on the left exhaust shield. Upon return of
25  the Subject Vehicle to Plaintiffs, the service manager at the authorized repair facility notified
26  Plaintiffs that the Subject Vehicle had been repaired and was safe to drive. Plaintiffs reasonably
27  relied on this representation by the manager of the expert repair technicians.

28    99. On or around April 6, 2015, Plaintiffs again delivered the Subject Vehicle to an authorized

1  FCA US LLC repair facility for repair. Plaintiffs complained of a buzzing noise from the engine.
2  The repair facility technicians repositioned the heat shield. The Subject Vehicle was then returned
3  to Plaintiffs, and the service manager at the authorized repair facility notified Plaintiffs that the
4  Subject Vehicle had been repaired and was safe to drive.  Plaintiffs reasonably relied on this
5  representation by the manager of the expert repair technicians.

6

7  <u>All Statute of Limitations Periods are Tolled by the Discovery Rule and the</u>
8  <u>Doctrine of Fraudulent Concealment</u>

9      98.    FCA US LLC concealed the fact that the Subject Vehicle was equipped with a defective
10  TIPM7.  FCA US LLC also concealed the major safety concerns related to the likely failures of the
11  TIPM7.

12     99.    FCA US LLC continued to misrepresent its ability to repair the Subject Vehicle in
13  conformity with the warranty throughout the warranty period.

14     100.   At all relevant times, FCA US LLC was aware of the defects in the TIPM7.

15     101.   As described in more detail above, as early as 2007, FCA US LLC began issuing
16  significant technical service bulletins as the result of NHTSA investigations to its authorized
17  dealers explaining the widespread issues with the TIPM7.  At no point prior to the sale of the
18  vehicle to Plaintiffs or during Plaintiffs' ownership of the Subject Vehicle did FCA US LLC or an
19  authorized dealer ever inform Plaintiffs of the ongoing irreparable defect.

20     102.   FCA US LLC had a duty to disclose the concealed facts alleged above because FCA US
21  LLC knew that Plaintiffs did not know a material fact and further knew that such facts were not
22  readily accessible to the Plaintiffs because FCA US LLC actively concealed those facts.

23     103.   FCA US LLC had a duty to disclose the concealed facts alleged above because FCA US
24  LLC was in a superior position of knowledge.

25     104.   FCA US LLC had a duty to disclose the concealed facts alleged above because FCA US
26  LLC actively concealed material facts in order to induce a false belief.

27     105.   FCA US LLC intended for Plaintiffs to rely on those misrepresentations to conceal the
28  fact that the defective TIPM7 could not be repaired.

1       106.   Prior to the sale of the Subject Vehicle, and at all times thereafter, Defendant therefore

2   failed to disclose the existence of the vehicle's inherent defects to Plaintiffs, and Defendant failed

3   to disclose its inability to repair these inherent defects, which prevented the Subject Vehicle from

4   conforming to its applicable warranties. In effect, after the sale of the Subject Vehicle, Defendant

5   fraudulently concealed from purchasers, including Plaintiffs, the fact that the dealers were not

6   properly repairing the defects to the TIPM7, and knew that the limited work that FCA US LLC had

7   authorized its dealerships to perform on those vehicles would not properly repair them.

8       107.   Plaintiffs did not discover that Defendant was unable to repair her vehicle under the

9   terms of the warranty until Plaintiffs' last visit to Defendant's authorized repair facility prior to the

10   expiration of the warranty on April 6, 2015.   Shortly after that attempted repair, Plaintiffs

11   discovered the Defendant was given a reasonable number of repair attempts and was unable to

12   repair the problems with her engine under warranty. It was not until the last attempt to repair the

13   vehicle under warranty that Plaintiffs were able to discovery that the vehicle could not actually be

14   repaired under the terms of the warranty.   Accordingly, Plaintiffs could not have discovered

15   Plaintiffs' claims related to fraud prior to April 6, 2015. Plaintiffs could not, through reasonable

16   and diligent investigation, have discovered such on an earlier date because of FCA US LLC's

17   fraudulent misrepresentations and concealment of the defects in the TIPM7 in Plaintiffs' vehicle,

18   as previously alleged above, and because of the repeated false assurances of FCA US LLC and its

19   service dealership agents made to Plaintiffs, on which Plaintiffs reasonably relied, that FCA US

20   LLC had and would repair any problems with the transmission in Plaintiffs' vehicle that occurred

21   during the express warranty period. The statute of limitations for each of Plaintiffs' claims against

22   FCA US LLC was therefore tolled under the delayed discovery rule and the doctrine of fraudulent

23   concealment until Plaintiffs could have first discovered on or around April 6, 2015 that FCA US

24   LLC had concealed the irreparable defects in the TIPM7.

25       108.   Because FCA US LLC failed to disclose these foregoing facts to Plaintiffs, all statute of

26   limitations periods with respect to sale of the Subject Vehicle were tolled by the doctrines of

27   fraudulent concealment, the discovery rule, and/or equitable tolling. As alleged herein, FCA US

28   LLC wrongfully concealed the fact (1) that the TIPM7 had a irreparable defect that posed

-18-

1  significant safety risk to the drivers and the public; and (2) that its dealerships were making
2  inadequate repairs that were incapable of addressing the root cause of the Vehicle's malfunctions.

3      109.  Plaintiffs did not discover the operative facts that are the basis of the claims alleged
4  herein because the facts were concealed in confidential and privileged documents, which a
5  consumer would not know about and could not obtain.

6      110.  No amount of diligence by Plaintiffs could have led to the discovery of these facts
7  because they were kept secret by FCA US LLC and, therefore, Plaintiffs were not at fault for
8  failing to discover these facts.

9      111.  Plaintiffs did not have actual knowledge of facts sufficient to put her on notice.
10  Plaintiffs did not know, nor could have known, about FCA US LLC's inability to repair the defects
11  in its TIPM7 because, as alleged above, FCA US LLC kept this information highly confidential,
12  and its dealership assured Plaintiffs that its repairs were effective.

13
14                          **FIRST CAUSE OF ACTION**
15              **Violation of the Song-Beverly Act – Breach of Express Warranty**

16      114.  Plaintiffs incorporate herein by reference each and every allegation contained in the
17  preceding and succeeding paragraphs as though herein fully restated and re-alleged.

18      115.  Express warranties accompanied the sale of the vehicle to Plaintiffs by which FCA US
19  LLC undertook to preserve or maintain the utility or performance of Plaintiffs' vehicle or provide
20  compensation if there was a failure in such utility or performance.

21      116.  The vehicle was delivered to Plaintiffs with serious defects and nonconformities to
22  warranty and developed other serious defects and nonconformities to warranty including, but not
23  limited to transmission, electrical, suspension, and engine defects.

24      117.  Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil Code
25  sections 1790 *et seq.* the vehicle constitutes "consumer goods" used primarily for family or
26  household purposes, and Plaintiffs have used the vehicle primarily for those purposes.

27  ///
28  ///

1    118. Plaintiffs are a "buyer" of consumer goods under the Act.

2    119. Defendant FCA US LLC is a "manufacturer" and/or "distributor" under the Act.

3    120. The foregoing defects and nonconformities to warranty manifested themselves within the
4    applicable express warranty period. The nonconformities substantially impair the use, value and/or
5    safety of the vehicle.

6    121. Plaintiffs delivered the vehicle to an authorized FCA US LLC repair facility for repair of
7    the nonconformities.

8    122. Defendant was unable to conform Plaintiffs' vehicle to the applicable express after a
9    reasonable number of repair attempts.

10   123. Notwithstanding Plaintiffs' entitlement, Defendant FCA US LLC has failed to either
11   promptly replace the new motor vehicle or promptly make restitution in accordance with the Song-
12   Beverly Act.

13   124. By failure of Defendant to remedy the defects as alleged above, or to issue a refund or
14   replacement, Defendant is in breach of its obligations under the Song-Beverly Act.

15   125. Under the Act, Plaintiffs are entitled to reimbursement of the price paid for the vehicle
16   less that amount directly attributable to use by the Plaintiffs prior to discovery of the
17   nonconformities.

18   126. Plaintiffs are entitled to all incidental, consequential, and general damages resulting from
19   Defendant's failure to comply with their obligations under the Song-Beverly Act.

20   127. Plaintiffs are entitled under the Song-Beverly Act to recover as part of the judgment a
21   sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably
22   incurred in connection with the commencement and prosecution of this action.

23   128. Plaintiffs are entitled in addition to the amounts recovered, a civil penalty of up to two
24   times the amount of actual damages in that FCA US LLC, has willfully failed to comply with its
25   responsibilities under the Act.

26   ///

27   ///

28   ///

1                     **SECOND CAUSE OF ACTION**

2         **Violation of the Song-Beverly Act – Breach of Implied Warranty**

3     129. Plaintiffs incorporate herein by reference each and every allegation contained in the

4 preceding and succeeding paragraphs as though herein fully restated and re-alleged.

5     130. FCA US LLC and its authorized dealership at which Plaintiffs purchased the Subject

6 Vehicle had reason to know the purpose of the Subject Vehicle at the time of sale of the Subject

7 Vehicle. The sale of the Subject Vehicle was accompanied by an implied warranty of fitness.

8     131. The sale of the Subject Vehicle was accompanied by an implied warranty that the Subject

9 Vehicle was merchantable pursuant to Civil Code section 1792.

10     132. The Subject Vehicle was not of the same quality as those generally acceptable in the

11 trade because it was equipped with transmission, electrical, suspension, and engine defects.

12     133. The Subject Vehicle was not fit for the ordinary purpose for which such goods are used

13 because it was equipped with transmission, electrical, suspension, and engine defects.

14     134. The Subject Vehicle did not measure up to the promises or facts stated on the container or

15 label because it was equipped with transmission, electrical, suspension, and engine defects.

16     135. Plaintiffs are entitled to justifiably revoke acceptance of the Subject Vehicle under Civil

17 Code section 1794, *et seq*; Plaintiffs hereby revokes acceptance of the Subject Vehicle.

18     136. Plaintiffs are entitled to replacement or reimbursement pursuant to Civil Code section

19 1794, *et seq.*

20     137. Plaintiffs are entitled to rescission of the contract pursuant to Civil Code section 1794, *et*

21 *seq.* and Commercial Code section 2711.

22     138. Plaintiffs are entitled to recover any "cover" damages under Commercial Code sections

23 2711, 2712, and Civil Code section 1794, *et seq.*

24     139. Plaintiffs are entitled to recover all incidental and consequential damages pursuant to

25 1794 *et seq* and Commercial Code sections 2711, 2712, and 2713 *et seq.*

26 ///

27 ///

28 ///

## THIRD CAUSE OF ACTION

### Fraudulent Inducement – Concealment

### (Against Defendant FCA US LLC Only)

140. Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

141. FCA US LLC concealed a known defect from Plaintiffs. The defective component is called the totally integrated power module (or TIPM). The TIPM consists of a computer, fuses, and internal relays, and is responsible for controlling and distributing electrical power to the entire vehicle—everything from steering and brakes, to the alarm, headlights, and the fuel pump.

142. Since the TIPM controls power to a wide variety of essential vehicle systems, including safety and security systems, the defect often leaves the vehicles incapable of providing reliable or safe transportation. This defect may cause a vehicle to fail to start (or take dozens of attempts before the engine will turn over) because of the defect, and vehicles start up at other times only to stall, sometimes while traveling at high speeds. The TIPM defect has caused headlights and taillights to suddenly shut off. It has also caused horns to honk, car alarms to sound, and windshield wipers to activate all on their own.

143. FCA US LLC intentionally failed to disclose the known TIPM defect, which was known only to it.

144. FCA US LLC concealed and suppressed material facts to boost confidence in its vehicles and falsely assure purchasers and lessors of its vehicles that FCA US LLC was a reputable manufacturer that stands behind its vehicles after they are sold and that its vehicles are safe and reliable.

145. FCA US LLC's deceptive omissions infected all purchases and leases of vehicles equipped with the TIPM-7, regardless of whether the vehicles were used or new at the time of acquisition. As early as 2007, FCA US LLC knew of the TIPM defects. FCA US LLC had ample opportunity to communicate to the public, its dealerships, and government regulators in a fashion that would have informed the car-buying public about the TIPM defects in vehicles equipped with the TIMP-7. For example, FCA US LLC could have recalled the vehicles. Plaintiffs reasonably,

1  justifiably, and detrimentally relied on FCA US LLC's silence about the TIPM defect when
2  deciding whether to purchase or lease a vehicle equipped with a TIPM-7, in part because FCA US
3  LLC was, and still is, in a position of superior knowledge about the TIPM defects.  Plaintiffs
4  reasonably trusted that FCA US LLC would not sell a dangerously defective vehicle or fail to
5  recall those vehicles – or otherwise make widely known that the vehicles were dangerously
6  defective such that current and prospective owners and lessees could make informed decisions to
7  protect themselves and their families.

8      146.  FCA US LLC acted with malice and a willful and conscious disregard for the rights and
9  safety of the Plaintiffs and the public in committing these fraudulent acts.

10     147.  FCA US LLC had, and still has, a duty to disclose the TIPM defects because they were
11 known and/or accessible only the FCA US LLC, which had superior knowledge and access to the
12 relevant facts, and because FCA US LLC knew that the relevant facts were not known or
13 reasonably discoverable by Plaintiffs.

14     148.  Under the National Traffic and Motor Vehicle Safety Act (the "Safety Act"), 49 U.S.C.
15 §§ 30101-30183, FCA US LLC had the duty to disclose the TIPM defects to NHTSA, and by
16 extension and implication to the public.  *Id.* § 30118(c). If FCA US LLC had disclosed the TIPM
17 defects to NHTSA, NHTSA would have made that information public on its websites
18 (www.safecar.gov and www.nhtsa.dot.gov) and its automobile safety telephone hotline.

19     149.  FCA US LLC still has not made full and adequate disclosure and continues to defraud
20 Plaintiffs by concealing material information regarding the TIPM defects that exist in the Vehicle
21 and the risks posed by those defects.

22     150.  FCA US LLC actively concealed and/or suppressed these material facts, in whole or in
23 part, to protect its profits and avoid recalls that would have hurt the brand's image and cost FCA
24 US LLC money, and it did so at the expense of Plaintiffs.

25     151.  Because FCA US LLC knew that any reasonable consumer would not purchase a
26 vehicle with a defective TIPM, or would pay only substantially less for that vehicle, and FCA US
27 LLC was concealing material information about the TIPM defects, FCA US LLC must have
28 known that Plaintiffs were acting on the basis of mistaken knowledge that their vehicles were safe

1 | and reliable when they decided to purchase or lease them at market price (without a discount to
2 | reflect that they contained a defective TIPM).

3 | 152.   Plaintiffs could not have discovered the TIPM defect because FCA US LLC kept all
4 | testing information confidential.

5 | 153.   That FCA US LLC actively concealed an important fact from Plaintiffs or prevented her
6 | from discovering that fact.

7 | 154.   Plaintiffs did not know about the TIPM defect.

8 | 155.   FCA US LLC intended to deceive Plaintiffs by continuing to market the vehicle and
9 | concealing the existence of a known TIPM defect which posed major safety concerns.

10 | 156.   Had the omitted information been disclosed, Plaintiffs reasonably would have behaved
11 | differently.

12 | 157.   Plaintiffs were harmed.

13 | 158.   FCA US LLC's concealment of the TIPM defect was a substantial factor in causing
14 | Plaintiffs' harm.

15 | 159.   The concealment substantially influenced Plaintiffs to purchase to Subject Vehicle;
16 | Plaintiffs would not have purchased the Subject Vehicle had the TIPM defect been disclosed prior
17 | to sale.

18 | 160.   The concealed TIPM defect was material.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, as follows:

a. For general, special and actual damages according to proof at trial;

b. For rescission of the purchase contract and restitution of all monies expended;

c. For diminution in value;

d. For incidental and consequential damages according to proof at trial;

e. For civil penalty in the amount of two times Plaintiffs' actual damages;

f. For prejudgment interest at the legal rate;

g. For punitive damages pursuant;

1    h. For reasonable attorney fees and costs of suit; and

2    i. For such other relief as the Court deems just and proper under the circumstances.

3

4    Dated:  March 24, 2017                                KNIGHT LAW GROUP, LLP

5

6

7                                                          Steve Mikhov (SBN 224676)

8                                                          Lauren A. Ungs (SBN 273374)
                                                           Amy Morse (SBN 290502)
9                                                          Attorneys for Plaintiff,
                                                           IGNACIO RAMOS and
10                                                         ELIZABETH RAMOS aka
                                                           ELIZABETH RAMOS-IBARRA
11

12    Plainitffs hereby demand trial by jury in this action.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

**(WITH ARBITRATION PROVISION)**

| Dealer Number 53971 | Contract Number | R.O.S. Number 29744100 | Stock Number K2273 |
|---|---|---|---|

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Creditor-Seller (Name and Address) |
|---|---|---|
| IGNACIO RAMOS 5980 DENVER AVE DINUBA CA 93618 TULARE | ELIZABETH RAMOS 5980 DENVER AVE DINUBA CA 93618 | LAMPE CHRYSLER DODGE JEEP RAM 151 N NEELEY ST VISALIA CA 93291 TULARE |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New-Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| NEW | 2013 | DODGE TRUCK RAM 1500 | 84 | 1C6RR6KTX0S507710 | Personal, family or household unless otherwise indicated below. ☑ business or commercial |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 3250.00 is |
|---|---|---|---|---|
| 5.89 % | $ 6361.79 (e) | $ 33568.69 | $ 39930.48 | $ 43180.48 (e) |

(e) means an estimate

### YOUR PAYMENT SCHEDULE WILL BE:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| One Payment of N/A | N/A | N/A |
| One Payment of N/A | N/A | N/A |
| 71 Payments | 554.59 | Monthly, Beginning 06/04/2013 |
| Payments | N/A | Monthly, Beginning N/A |
| One Final Payment | 554.59 | DUE ON 05/04/2019 |
| N/A | | DUE ON N/A |

Late Charge. If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.
Prepayment. If you pay off all your debt early, you may be charged a minimum finance charge.
Security Interest. You are giving a security interest in the vehicle being purchased.
Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

### ITEMIZATION OF THE AMOUNT FINANCED (Seller may keep part of the amounts paid to others.)

1. Total Cash Price
   A. Cash Price of Motor Vehicle and Accessories
      1. Cash Price Vehicle .......................... $ 31245.00
      2. Cash Price Accessories .................... $ N/A
      3. Other (Nontaxable) ......................... $ N/A
         Describe .......................... $ N/A
      B. Document Processing Charge (not a governmental fee) ... $ 80.00 (B)
      C. Emissions Testing Charge (not a governmental fee) ..... $ N/A (C)
      D. (Optional) Theft Deterrent Device N/A ........... $ N/A (D)
      (Optional) Theft Deterrent Device (to whom paid) N/A .... $ N/A (F)
      G. (Optional) Surface Protection Product (to whom paid) N/A ... $ N/A (G)
      H. (Optional ... N/A .......................... $ N/A (H)
      J. Electronic Vehicle Registration ................. $ 2740.94 (I)
         (not a governmental ...
      L. (Optional) Service Contract (to whom paid) N/A ...... $ N/A (L)
      M. (Optional) Service Contract (to whom paid) N/A ...... $ N/A (M)
      N. (Optional) Service Contract (to whom paid) N/A ...... $ N/A (N)
      O. (Optional) Service Contract (to whom paid) N/A ...... $ N/A (O)

### STATEMENT OF INSURANCE

NOTICE. No person is required, as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

#### Vehicle Insurance

| | | | Term | | Premium |
|---|---|---|---|---|---|
| $ N/A Ded. Comp, Fire & Theft | | N/A Mos. | $ | N/A |
| $ N/A Ded. Collision | | N/A Mos. | $ | N/A |
| Bodily Injury: $ N/A Limits N/A | | N/A Mos. | $ | N/A |
| Property Damage $ N/A Limits N/A | | N/A Mos. | $ | N/A |
| Medical N/A | | N/A Mos. | $ | N/A |
| | | N/A Mos. | $ | N/A |
| Total Vehicle Insurance Premiums | | | | $ | N/A (a) |

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X _____
Co-Buyer X _____
Seller X _____

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

### Application for Optional Credit Insurance

☐ Credit Life: ☐ Buyer ☐ Co-Buyer ☐ Both
☐ Credit Disability (Buyer Only)

| | Term | Exp. | Premium |
|---|---|---|---|
| Credit Life | N/A Mos. | N/A | $ N/A |
| Credit Disability | N/A Mos. | N/A | $ N/A |
| Total Credit Insurance Premiums | N/A | | $ N/A (b) |

Insurance Company Name N/A
Home Office Address N/A

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any income or payment, or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

N/A                                          (e) $ ___ N/A (P)

(see downpayment and trade-in calculation)

Q. (Optional) Gap Contract (to whom paid) __EXPRESS AUTO GAP__ $ __625.00__ (Q)

R. (Optional) Used Vehicle Contract Cancellation Option Agreement   $ ___N/A (R)

S. Other (to whom paid) __N/A__

For __N/A__                                                                       $ ___N/A (S)

Total Cash Price (A through S)                                          $ __36414.94__(1)

2. Amounts Paid to Public Officials

A. Vehicle License Fees __ESTIMATED__                              $ __203.00__ (A)

B. Registration/Transfer/Titling Fees  __ESTIMATED__        $ __192.00__ (B)

C. California Tire Fees                                                          $ __8.75__ (C)

D. Other __N/A__                                                              $ ___N/A (D)

Total Official Fees (A through D)                                      $ __403.75__ (2)

3. Amount Paid to Insurance Companies

(Total premiums from Statement of Insurance column a + b)  $ ___N/A (3)

4. ☐ State Emissions Certification Fee or ☐ State Emissions Exemption Fee   $ ___N/A (4)

5. Subtotal (1 through 4)                                                  $ __36818.69__(5)

6. Total Downpayment:

A. Agreed Trade-In Value: Yr ___N/A__ Make __N/A__

Model __N/A__ Odom __N/A__                                      $ ___N/A (A)

VIN __N/A__

B. Less Prior Credit or Lease Balance (e)                          $ ___N/A (B)

C. Net Trade-In (A less B) (indicate if a negative number)  $ ___N/A (C)

D. Deferred Downpayment                                                $ ___N/A (D)

E. Manufacturer's Rebate                                                  $ __3250.00__ (E)

F. Other __N/A__                                                              $ ___N/A (F)

G. Cash                                                                              $ ___N/A (G)

Total Downpayment (C through G)                                    $ __3250.00__ (6)

(If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1P above)

7. Amount Financed (5 less 6)                                          $ __33568.69__(7)

---

**SELLER ASSISTED LOAN**

BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN.

Proceeds of Loan From: __N/A__

Amount $ __N/A__   Finance Charges __N/A__

Total $ __N/A__   Payable in __N/A__

Installments of $ __N/A__

from this Loan is shown in Item 6D.

---

**AUTO BROKER FEE DISCLOSURE**

If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:

☐   Name of autobroker receiving fee, if applicable: __N/A__

---

**SELLER'S RIGHT TO CANCEL.** If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on the page giving the Seller the right to cancel if Seller is unable to assign this contract to a financial institution will apply.

Buyer X _____   Co-Buyer X _____

**Agreement to Arbitrate:** By signing below, you agree that, pursuant to the Arbitration Provision on the reverse side of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

Buyer Signs X _____

Co-Buyer Signs X _____

---

**OPTION:** ☐ You pay no finance charge if the Amount Financed, Item 7, is paid in full on or before _____, Year _____   SELLER'S INITIALS _____

---

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED BY LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.

WARNING: YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.

FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT. THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.

S/S X _____

---

**Payoff Agreement.** Seller _____ the payoff amount shown in Item 6B of the Itemization of Amount Financed as the

Seller agrees to pay the payoff amount shown on the lienholder or lessor of the trade-in vehicle, or its designee. If the actual payoff amount is more than the amount shown in 6B, you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown in 6B, Seller will return to you any excess. Seller receives from your prior lienholder or lessor. Except as stated in the NOTICE

---

that: (1) You are not eligible for insurance if you have reached your 65th birthday; (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR CHIROPRACTOR IN THE LAST 6 MONTHS (Refer to "Total Disabilities Not Covered" in your policy for details).

You want to buy the credit insurance.

X _____

Date   Buyer Signature   Age

X _____

Date   Co-Buyer Signature   Age

**OPTIONAL GAP CONTRACT** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 1Q of the Itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term __72__ Mos. __EXPRESS AUTO GAP__

Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X _____

**OPTIONAL SERVICE CONTRACT(S)** You want to purchase the service contract(s) written with the following company(ies) for the term(s) shown below for the charge(s) shown in Item 1K, 1L, 1M, 1N, and/or 1O.

1K Company __PORTFOLIO__

Term __60__ Mos. or __100000__ Miles

1L Company __N/A__

Term __N/A__ Mos. or __N/A__ Miles

1M Company __N/A__

Term __N/A__ Mos. or __N/A__ Miles

1N Company __N/A__

Term __N/A__ Mos. or __N/A__ Miles

1O Company __N/A__

Term __N/A__ Mos. or __N/A__ Miles

Buyer X _____

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

Buyer Signs X _____

Co-Buyer Signs X _____

Seller agrees to pay the payoff amount shown in 6B to the lienholder or lessor of the trade-in vehicle, or its designee. If the actual payoff amount is more than the amount shown in 6B, you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown in 6B, Seller will refund to you any overage Seller receives from your prior lienholder or lessor. Except as stated in the "NOTICE" on the back of this contract, any assignee of this contract is not liable for any claims or defenses the consumer could assert against the Seller or holder of the contract.

Buyer Signature-X  **N/A**

Co-Buyer Signature X  **N/A**

**Notice to buyer:** (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled-in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If you have a complaint concerning this sale, you should try to resolve it with the seller.

Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Department of Motor Vehicles, or any combination thereof.

After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.

Buyer Signature X  _signature_

Co-Buyer Signature X  _signature_

### The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.

**THERE IS NO COOLING-OFF PERIOD UNLESS YOU OBTAIN A CONTRACT CANCELLATION OPTION**

California law does not provide for a "cooling-off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud. However, California law does require a seller to offer a 2-day contract cancellation option on used vehicles with a purchase price of less than $40,000, subject to certain statutory conditions. This contract cancellation option requirement does not apply to the sale of a recreational vehicle, a motorcycle, or an off-highway motor vehicle subject to identification under California law. See the vehicle contract cancellation option agreement for details.

YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU ACKNOWLEDGE THAT YOU HAVE READ BOTH SIDES OF THIS CONTRACT, INCLUDING THE ARBITRATION PROVISION ON THE REVERSE SIDE, BEFORE SIGNING BELOW. YOU CONFIRM THAT YOU RECEIVED A COMPLETELY FILLED-IN COPY WHEN YOU SIGNED IT.

Buyer Signature X  _signature_  Date  **05/05/13**   Co-Buyer Signature X  _signature_  Date  **05/05/13**

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other Owner Signature X  **N/A**      Address  **N/A**

**GUARANTY:** To induce us to sell the vehicle to Buyer, each person who signs as a Guarantor individually guarantees the payment of this contract. If Buyer fails to pay any money owing on this contract, each Guarantor must pay it when asked. Each Guarantor will be liable for the total amount owing even if other persons also sign as Guarantor, and even if Buyer has a complete defense to Guarantor's demand for reimbursement. Each Guarantor agrees to be liable even if we do one or more of the following: (1) give the Buyer more time to pay one or more payments; (2) give a full or partial release to any other Guarantor; (3) release any security; (4) accept less from the Buyer than the total amount owing; or (5) otherwise reach a settlement relating to this contract or extend the contract. Each Guarantor acknowledges receipt of a completed copy of this contract and guaranty at the time of signing.

Guarantor waives notice of acceptance of this Guaranty, notice of the Buyer's non-payment, non-performance, and default, and notices of the amount owing at any time, and of any demands upon the Buyer.

**N/A**

Guarantor X **N/A**      Date **N/A**      Guarantor X **N/A**      Date **N/A**

Address ___      Address **N/A**

Seller Signs  **LAMPE CHRYSLER DODGE JEEP RAM**  Date **05/05/13**  By x **FAISSAL ABOU-ALT**  _signature_      Title: **F&I MNGR**

**LAW** FORM NO. 553-CA-ARB  REV. 7/12 U.S. PATENT NO. D450 752
©2012 The Reynolds and Reynolds Company  TO ORDER: www.reysource.com 1-800-344-0996; fax 1-800-631-6055
THE PRINTER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

FILE COPY

KNIGHT LAW GROUP, LLP
Steve Mikhov (SBN 224676)
2   Amy Morse (SBN 290502)
1801 Century Park East, Suite 2300
3   Los Angeles, CA 90067
Telephone: (310) 552-2250
4   Fax: (310) 552-7973

5
Attorneys for Plaintiffs,
6   IGNACIO RAMOS and
ELIZABETH RAMOS aka
7   ELIZABETH RAMOS-IBARRA

8

FILED
TULARE COUNTY SUPERIOR COURT
VISALIA DIVISION

MAR 28 2017

LARAYNE CLEEK, CLERK
BY _____

9                         SUPERIOR COURT OF CALIFORNIA
COUNTY OF TULARE

10  | IGNACIO RAMOS and | Case No.:  **269091** |
11  | ELIZABETH RAMOS aka | |
| ELIZABETH RAMOS-IBARRA, | Unlimited Jurisdiction |
12  | | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | |
13  | | |
14  | vs. | *Assigned for All Purposes to the Honorable* |
15  | FCA US LLC, a Delaware Limited Liability Company; TULARE SAG, INC., a California | |
16  | Corporation dba LAMPE CHRYSLER DODGE JEEP RAM; and DOES 1 through | Department         **BY FAX** |
17  | 10, Inclusive, | |
18  | Defendants. | |

19

20      Plaintiffs, IGNACIO RAMOS and ELIZABETH RAMOS, hereby demand trial by jury in

21  this action.

22  Dated:   March 24, 2017                      KNIGHT LAW GROUP, LLP

23

24

25                                               STEVE MIKHOV (SBN 224676)
AMY MORSE (SBN 290502)
26                                               Attorneys for Plaintiffs,
IGNACIO RAMOS and
27                                               ELIZABETH RAMOS aka
ELIZABETH RAMOS-IBARRA
28

-1-
**DEMAND FOR JURY TRIAL**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):<br>Steve Mikhov (SBN 224676)<br>Knight Law Group, LLP<br>1801 Century Park East, Suite 2300, Los Angeles, CA 90067<br>TELEPHONE NO.: (310) 552-2250   FAX NO.: (310) 552-7973<br>ATTORNEY FOR (Name): IGNACIO RAMOS and ELIZABETH RAMOS aka ELIZABETH RAMOS-IBARRA | FOR COURT USE ONLY |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF Tulare<br>STREET ADDRESS: 221 South Mooney Boulevard<br>MAILING ADDRESS: Same as above<br>CITY AND ZIP CODE: Visalia, CA 93291<br>BRANCH NAME: County Civic Center | FILED<br>TULARE COUNTY SUPERIOR COURT<br>VISALIA DIVISION<br><br>MAR 28 2017<br><br>LARAYNE CLEEK, CLERK<br>BY _____ |

| CASE NAME:   IGNACIO RAMOS and ELIZABETH RAMOS aka ELIZABETH RAMOS-IBARRA<br>v. FCA US LLC, a Delaware Limited Liability Company, et al. | |
|---|---|
| **CIVIL CASE COVER SHEET**<br>[X] Unlimited   [ ] Limited<br>(Amount   (Amount<br>demanded   demanded is<br>exceeds $25,000)   $25,000 or less) | **Complex Case Designation**<br>[ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>**269091**<br>JUDGE:<br>DEPT: |

BY FAX

Items 1–6 below must be completed (see instructions on page 2).

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [X] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | **Real Property** | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] Other complaint (not specified above) (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition (not specified above) (43) |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [ ] is   [X] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties    d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve    e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence    f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [X] monetary   b. [ ] nonmonetary; declaratory or injunctive relief   c. [X] punitive
4. Number of causes of action (specify): 3
5. This case [ ] is   [X] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 3/24/17

Steve Mikhov
(TYPE OR PRINT NAME)                              ▶                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice–Physicians & Surgeons
   Other Professional Health Care Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip and fall)
   Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
   Intentional Infliction of Emotional Distress
   Negligent Infliction of Emotional Distress
   Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
   Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court Case Matter
   Writ–Other Limited Court Case Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of County)
   Confession of Judgment *(non-domestic relations)*
   Sister State Judgment
   Administrative Agency Award *(not unpaid taxes)*
   Petition/Certification of Entry of Judgment on Unpaid Taxes
   Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-harassment)*
   Mechanics Lien
   Other Commercial Complaint Case *(non-tort/non-complex)*
   Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late Claim
   Other Civil Petition



# Superior Court of the State of California

### COUNTY OF TULARE
CIVIL LEGAL PROCESSING
221 S. Mooney Blvd., Room 201
Visalia, California 93291
Telephone: (559) 730-5000

## ALTERNATIVE DISPUTE RESOLUTION PACKAGE

This is Tulare County Superior Court's Alternative Dispute Resolution (ADR) Package. The package contains:

1. The court's current ADR Referral List;

2. Tulare County Superior Court's Local Rule 600 on Case Management Conferences;

3. Information about ADR.

At the time a civil complaint is filed, the clerk will issue a hearing date and time for the Case Management Conference (CMC). This information is placed on the front page of the complaint. Plaintiff must serve notice of the CMC hearing and this ADR Package on each defendant with the summons and complaint.

**All parties appearing in the action are ordered to meet and confer prior to the CMC date regarding an agreed upon mediator and mediation date and time under Local Rule 600(a)(5).**

Each party must file and serve a CMC statement on Judicial Council form CM-110 no later than 15 calendar days before the CMC hearing under California Rules of Court, rule 3.725 and Local Rule 600(a)(6).

Counsel and unrepresented parties are required to be present, either in person or by CourtCall (See Local Rule 108 regarding CourtCall), at the CMC hearing and have authority to enter into a mediation agreement if the parties have agreed to mediate. Each party appearing shall also have sufficient information and understanding of the case in order to evaluate it accurately.

**Please be advised that monetary and/or terminating sanctions shall be imposed against parties and counsel who fail to comply with state and local rules regarding case management conferences without good cause.**

| ADR REFERRAL LIST<br>January 2017 | | |
|---|---|---|
| **NAME** | **HOURLY RATE** | **PROFILE INFORMATION** |
| Honorable Howard R. Broadman (Ret.)<br>300 N. Willis<br>Visalia, CA. 93291<br>Phone: (559) 738-1800<br>Fax: (559) 738-1102<br>Email:<br>judgebroadman@judgebroadman.com | $400. per hour | Click Here<br><br>Resume on file |
| Kenneth M. Byrum<br>5080 California Ave #200<br>Bakersfield, CA 93309<br>Phone: (661) 861-6191<br>Fax: (661) 861-6190<br>Email: ken@kmbmediation.com | $300.00 per hour | Click Here<br><br>Resume on file |
| Russell D. Cook<br>1233 West Shaw, Suite 100<br>Fresno, CA 93711<br>Phone: (559) 225-2510<br>Fax: (559) 229-3941<br>Email: rdcook@rdcooklaw.com | $285.00 per hour | Click Here<br><br>Resume on file |
| Donald H. Glasrud<br>Dietrich, Glasrud, Mallek & Aune<br>5250 North Palm Ave, Suite 402<br>Fresno, CA 93704<br>Phone: (559) 435-5250<br>Fax: (559) 435-8776<br>Email: dhg@dgmalaw.com | $375.00 per hour | Click Here<br><br>Resume on file |
| M. Troy Hazelton<br>3585 W. Beechwood Ave, Suite 101<br>Fresno, CA 93711<br>Phone: (559) 431-1300<br>Fax: (559) 431-1442<br>Email: Thazelton@pgllp.com | $195.00 per hour | Click Here<br><br>Resume on file |
| Lee M. Jacobson<br>1690 W. Shaw Avenue, Suite 201<br>Fresno, CA 93711<br>Phone: (559) 448-0400<br>Fax: (559) 448-0123<br>Email: lmj@jhnmlaw.com | $290.00 per hour | Click Here<br><br>Resume on file |

| | | |
|---|---|---|
| Daniel O. Jamison<br>8080 North Palm Avenue<br>Fresno, CA 93711<br>Phone: (559)432-4500<br>Fax: (559)432-4590<br>Email: djamison@daklaw.com | $320 per hour<br>including travel time | Click Here<br><br>Resume on file<br><br>. |
| Honorable Patrick J. O'Hara (Ret.)<br>300 N. Willis<br>Visalia, CA. 93291<br>Phone: (559) 429-4570<br>Fax: (559) 429-4575<br>Email: judgeohara@judgeohara.com<br>Website: www.judgeohara.com | $400.00 per hour | Click Here<br><br>Resume on file |
| Richard B. Isham<br>3814 W. Robinwood<br>P.O. Box 8139<br>Visalia, CA. 93290<br>Phone: (559) 733-2257<br>Cell: (559)738-3963<br>Email: rbisham@att.net | $300.00 per hour | Click Here<br><br>Resume on file |
| Leah Catherine Launey<br>42490 Kaweah River Drive<br>Three Rivers, CA 93271<br>Phone: (559) 561-4270<br>Fax: (559) 561-4273<br>Email: lclauney@lanneymediation.com | $175.00 per hour<br>2 hour minimum | Click Here<br><br>Resume on file |
| Kevin G.Little<br>1099 E. Champlain Drive, Suite A-124<br>Fresno, CA 93720<br>Phone: (559)708-4750<br>Fax: (559)420-0830<br>Email: kevinglittle@yahoo.com | . $200.00 per hour<br>2 hour minimum | Click Here<br><br>Resume on file |
| Linda Luke<br>632 W. Oak Avenue<br>Visalia, CA. 93291<br>Phone: (559) 733-9505<br>Fax: (559) 733-3910<br>Email: linda.luke@icloud.com | $275.00 per hour | Click Here<br><br>Resume on file |
| John T. Nagel<br>1233 W. Shaw Avenue, #100<br>Fresno, CA 93711<br>Phone: (559)225-2510<br>Fax: (559) 225-2389<br>Email: johntnagel@comcast.net | $245.00 per hour | Click Here<br><br>Resume on file |

| | | |
|---|---|---|
| Douglas E. Noll<br>P.O. Box 2336<br>Clovis, CA. 93613<br>Phone: 800-785-4487<br>Fax: 877-765-1353<br>Email: doug@nollassociates.com | $400 per hour<br>4 hour minimum | Click Here<br><br>Resume on file |
| Honorable Robert. H. Oliver (Ret.)<br>5260 N. Palm Ave, Fourth Floor<br>Fresno, CA 93704<br>Fax: (559) 432-5620<br>Email: roliver@bakermanock.com | $400.00 per hour (2<br>Hour Minimum) | Click Here<br><br>Resume on file |
| James M. Phillips<br>8080 N. Palm Ave, Suite 101<br>Fresno, CA 93711<br>Phone: (559) 261-9340<br>Fax: (888) 974-4321<br>Email: phillipsgp@aol.com | $340.00 per hour | Click Here<br><br>Resume on file |
| Michael Renberg<br>1540 E. Shaw Ave, Suite 123<br>Fresno, CA 93710<br>Phone: (559) 431-6300<br>Fax: (559) 432-1018<br>Email: mrenberg@prcelaw.com | $240.00 per hour | Click Here<br><br>Resume on file |
| Laurie Quigley Saldana<br>791 Price Street. #323<br>Pismo Beach, CA. 93449<br>Phone: (559) 730-1812<br>Email: laurie@mediationcentral.net | $350.00 per hour | Click Here<br><br>Resume on file |
| Tom Simonian<br>1100 W. Center Ave<br>Visalia, CA. 93291<br>Phone: (559) 732-7111<br>Fax: (559)732-1540 | $290.00 per hour | Click Here<br><br>Resume on file |
| Andrew R. Weiss<br>7109 North Fresno Street, Suite 250<br>Fresno, CA 93720<br>Phone: (559) 438-2080<br>Cell: (559) 259-4663<br>Email: aweiss@weissmartin.com | $300.00 per hour | Click Here<br>Resume on file |

## CHAPTER 6 – MANAGING CIVIL CASES

Rule 600 – Case Management Conference

(a) The Judicial Council has implemented state rules for the management of civil cases (Cal. Rules of Court, Chapter 2 Trial Court Management of Civil Cases, rules 10.900, et. Seq.).

In recognition of the state rules requiring the court to implement a case management Plan, the court elects to follow California Rules of Court, rule 3.714.

(1) At the time the complaint is filed, the clerk will issue a hearing date for the Case Management Conference (CMC) to plaintiff that is no less than 120 days after the filing of the complaint. The clerk will also provide the Plaintiff with the court's Alternative Dispute Resolution (ADR) package including the list of the names of the mediators who have applied and met the court's mediation/arbitration qualifications pursuant to the program adopted by the court under California Rules of Court, rule 10.781. Plaintiff must serve a Notice of CMC and the ADR package on each defendant along with the summons and complaint.

(2) Any party who files and serves a cross-complaint prior to the CMC must serve on each cross-defendant who is a new party to the action, a copy of the Notice of CMC and the ADR package along with the summons and cross-complaint. If a new cross-defendant is served after the initial CMC, the cross-complainant must serve the new cross-defendant with notice of any pending CMC, any assigned mediation date, trial, or settlement conference dates, and any other dates set by the court or orders made at the CMC.

(3) If the plaintiff adds a new defendant or identifies a fictitiously named defendant after the initial CMC, along with the summons and complaint, plaintiff must serve the newly named defendant with notice of any pending CMC, any pending mediation date, any assigned trial and settlement conference dates, and any other dates set by the court or orders made at the CMC.

(4) Proof of service of Notice of the CMC must be filed with the court within 60 days from the date the complaint is filed and may be included in the proof of service of the summons and complaint or cross-complaint.

(5) This court has found that mediation is highly desirable and orders the parties to meet and confer prior to the CMC date regarding an agreed upon mediator and mediation date and time. A list of mediators and their fees are provided by the court in its ADR package. The mediator must be agreed upon before the CMC and the mediation date and time cleared with the mediator so the court may enter the date in the court's minute order.

(6) Under California Rules of Court, rule 3.725, no later than 15 calendar days before the date set for the CMC, each party must file a CMC statement and serve it on all other

parties in the case. Parties must use the mandatory CMC Statement (Judicial Council form CM-110). All applicable items on the form must be completed.

(7) In lieu of each party's filing a separate case management statement, any two or more parties may file a joint statement.

(b) Presence Required – Counsel and unrepresented parties are required to be present, either in person or by telephonic appearance pursuant to The Superior Court of Tulare County, Local Rules, rule 108, and must have: (1) sufficient information and understanding of the case to evaluate it accurately, and (2) sufficient authority to enter into binding agreements such as the diversion of the case to arbitration, including binding arbitration, the setting of a trial date and mandatory settlement conference date, the dismissal of doe defendants or other parties, and the setting of a further case management conference.

(c) Compliance – Failure to attend the case management conference will result in the court making whatever orders and imposing whatever sanctions as may be necessary and appropriate to obtain compliance with these rules, including but not limited to, a waiver of the right to a jury trial and a waiver of the right to object to a referral to arbitration or other alternate dispute resolution procedure.

(d) Waiver of Notice – When all parties are present at the case management conference and a trial date and settlement conference dates are agreed to by the parties or ordered by the court, such presence is an effective waiver of a separate or formal notice of settlement conference and trial date. (01/01/03) (Revised 01/01/07, 01/01/09) (07/01/11)

## Alternative Dispute Resolution

There are different processes available to settle lawsuits without having to go to trial. The most common forms of ADR are Mediation, Arbitration, and Case Evaluation. In ADR, a trained, impartial person decides disputes or helps the parties reach resolutions of their disputes for themselves. The persons are neutrals who are normally chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

### Advantages of ADR

- Often quicker than going to trial, a dispute may be resolved in a matter or days or weeks instead of months or years.

- Often less expensive, saving the litigants court costs, attorney's fees and expert fees.

- Can permit more participation, allowing the parties the opportunity to tell their side of the story with more control over the outcome.

- Allows for flexibility in choice of ADR processes and resolution of the dispute.

- Fosters cooperation by allowing the parties to work together with the neutral to resolve the dispute and mutually agree to a remedy.

- Often less stressful than litigation. Most people have reported a high degree of satisfaction with ADR

Because of these advantages, many parties choose ADR to resolve disputes instead of filing a lawsuit. Even after a lawsuit has been filed, the court can refer the dispute to a neutral before the lawsuit becomes costly. ADR has been used to resolve disputes even after trial, when the result is appealed.

## Disadvantages of ADR

ADR may not be suitable for every dispute.

If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute. The neutral may charge a fee for his or her services. If the dispute is not resolved through ADR, the parties may then have to face the usual and traditional costs, such as attorney's fees and expert fees.

Lawsuits must be brought within specified periods of time, known as Statutes of Limitations. Parties must be careful not to let a Statute of Limitation run while a dispute is in an ADR process.

## The Most Common Types of ADR

### Mediation

In mediation, the mediator (a neutral) assists the parties in reaching a mutually acceptable resolution of their dispute. Unlike lawsuits or some other types of ADR, the mediator does not decide how the dispute is to be resolved. The parties do. It is a cooperative process in which the parties work together toward a resolution that tries to meet everyone's interests, instead of working against each other. Mediation normally leads to better relations between the parties and to lasting resolutions. It is particularly effective when parties have a continuing relationship, such as neighbors or businesses. It also is very effective where personal feelings are getting in the way of a resolution. Mediation normally gives the parties a chance to freely express their positions. Mediation can be successful for victims seeking restitution from offenders. When there has been violence between the parties, a mediator can meet separately with the parties.

### Arbitration

In arbitration, the arbitrator (a neutral) reviews evidence, hears arguments, and makes a decision (award) to resolve the dispute. This is very different from mediation whereby the mediator helps the parties reach their won resolution. Arbitration normally is more informal, quicker, and less expensive than a lawsuit. In a matter of hours, an arbitrator often can hear a case that otherwise may take a week in court to try. This is because the evidence can be submitted by documents rather than by testimony.

**There are Two Types of Arbitration in California**

1. **Private arbitration** by agreement of the parties involved in the dispute. This type takes place outside of the court and normally is binding. In most cases, "binding" means that the arbitrator's decision (award) is final and there will not be a trial or an opportunity to appeal the decision.

2. **Judicial arbitration** ordered by the court. The arbitrator's decision is not binding unless the parties agree to be bound. A party who does not like the award may file a request for trial with the court within a specified time. However, if that party does not receive a more favorable result at trial, the party may have to pay a penalty.