1
2
3
4
5                    **UNITED STATES DISTRICT COURT**
6                    **EASTERN DISTRICT OF CALIFORNIA**
7

8   IGNACIO RAMOS *et al.*,                    **CASE NO. 1:17-CV-00973**
9                        Plaintiffs,           **ORDER GRANTING IN PART AND**
                                               **DENYING IN PART DEFENDANT'S**
10  v.                                         **MOTION FOR PARTIAL SUMMARY**
                                               **JUDGMENT**
11  FCA US LLC,
                                               (Doc. No. 47)
12                       Defendant.
13

14                          **I.  Background**

15        This is a lawsuit about two individuals who together purchased a new motor vehicle only

16  to learn later that the vehicle had a defect and did not conform to the manufacturer's warranty.

17  The two individuals are Plaintiffs Ignacio Ramos and Elizabeth Ramos ("Plaintiffs").  The vehicle

18  is a 2013 Dodge Ram 1500.  The vehicle manufacturer is Defendant FCA US LLC ("FCA").

19  Plaintiffs sued FCA for breach of warranty and fraudulent concealment of the defect, and

20  Plaintiffs requested punitive damages for the fraudulent concealment and statutory penalties for

21  the breach of express warranty.

22        FCA now moves for summary judgment on the following: (1) Plaintiffs' claim for

23  fraudulent concealment; (2) Plaintiffs' request for punitive damages for the fraudulent

24  concealment; and (3) Plaintiffs' request for civil penalties for the violation of California's Song-

25  Beverly Consumer Warranty Act ("Song-Beverly Act").[1]  The Court will grant summary judgment

26  in FCA's favor on Plaintiffs' claim for fraudulent concealment claim and request for punitive

27  damages, but the Court will deny summary judgment on Plaintiffs' request for civil penalties.

28  _____
    [1]  The Song-Beverly Act is codified at Cal. Civ. Code §§ 1790 *et seq.*

## II.  Facts

Based on the evidence presented by the parties and all reasonable inferences drawn in favor of Plaintiffs, the relevant facts at this summary judgment phase are as follows.

On May 5, 2013, Plaintiffs purchased a new 2013 Dodge RAM 1500 from Lampe Chrysler Dodge Jeep Ram in Visalia, California.  See Doc. No. 40 at 2.  The vehicle was manufactured and warranted by FCA.  See id.; Doc. No. 62-1 at 2.  When Plaintiffs purchased the vehicle, the vehicle had 84 miles on the odometer.  See Doc. No. 40 at 2.  Plaintiffs purchased the vehicle for either $43,180.48 or $47,535.68.[2]

After the purchase, the vehicle exhibited problems.  The problems included the "Check Engine" light turning on, the USB outlets and cigarette outfits not working, the power supply fuse being blown, the vehicle making metal-to-metal sounds and rattling sounds, an exhaust leak, a broken stud on the exhaust manifold, a loose heat shield, and a spot appearing on the back-up camera display.  See Doc. No. 62-5; Doc. No. 62-6; Doc. No. 62-7; Doc. No. 62-8.  In response to these problems, Plaintiffs took the vehicle to be repaired on at least five separate occasions between May 2013 and May 2016.  See Doc. No. 62-3 (the "Warranty Claim Summary Report" identifying "repair dates" of April 10, 2013; January 14, 2015; February 24, 2015; April 8, 2015; May 17, 2016); Doc. No. 47-9 at 4 (expert report of Darrell Blasjo, Plaintiffs' automotive expert, stating that the vehicle was presented for service on May 11, 2015; January 13, 2015; February 23, 2015; and April 6, 2015); Doc. No. 65-5 at 3 (FCA stating that it is "[u]ndisputed that Plaintiffs presented their vehicle for repairs as set forth in the repair orders").

In November 2015, the vehicle was repossessed.  See Doc. No. 47-4 at 3-4.  When the vehicle was repossessed, the vehicle had approximately 20,000 miles on the odometer and was

---

[2]  The purchase amount of the vehicle is unclear to the Court, largely due to Plaintiffs' imperfect briefing.  In Plaintiffs' response to FCA's statement of undisputed material facts, Plaintiffs asserted that the "total amount paid for the vehicle was $47,535.68."  Doc. No. 62-1 at 2.  To support this assertion, Plaintiffs cited to their "Additional Meterial [sic] Facts and Evidence," wherein Plaintiffs asserted that they purchased the vehicle for $43,180.48.  See id. at 13.  To support this assertion, Plaintiffs cited to a host of inadmissible sources, including allegations in Plaintiffs' proposed amended complaint.  See id.  Plaintiffs also cited to what appears to be a barely-legible receipt for the vehicle purchase, which states that "[t]he total cost of your purchase on credit, including your down payment of $3,250.00 is $43,180.48."  Doc. No. 1-1 at 29-30 (cited to by Doc. No. 62-1 at 13).  FCA does not dispute that the vehicle was purchased for $43,180.48.  See Doc. No. 65-6 at 2.

still exhibiting problems, including making noises, engine problems, and the airbag light being on. See Doc. No. 62-13 at 2-4; Doc. No. 62-1 at 2.

On April 9, 2016, Plaintiff Ignacio Ramos called FCA and asked to be reimbursed for the purchase of the vehicle because, according to Mr. Ramos, the vehicle was a lemon. See Doc. No. 40 at 3 ("Undisputed Facts" in the parties' joint pretrial statement); Doc. No. 62-10 ("Customer Assistance Inquiry Record" stating that "Customer seeks: To get his payments back" and "Customer states: Vehicle was a lemon"). On FCA's "Customer Assistance Inquiry Record" — which appears to be an FCA business record that documented FCA's phone call with Mr. Ramos on April 9, 2016 — it states that there was a "buzz," "squeak," "rattle," and "unresolved noise after 4 visits." Id.; see Doc. No. 62-2 at ¶ 14.

On March 28, 2017, Plaintiffs filed suit against FCA in California state court. See Doc. No. 1 at 2; Doc. No. 1-1 at 3. FCA then removed the lawsuit to this Court on grounds of diversity jurisdiction. See Doc. No. 1 (citing 28 U.S.C. § 1332). Plaintiffs' complaint pleads three causes of action against FCA: (1) violation of the Song-Beverly Act for breaching an express warranty; (2) violation of the Song-Beverly Act for breaching an implied warranty; and (3) fraudulent inducement-concealment ("fraudulent concealment") of a known defect. The fraudulent concealment claim is essentially based on the following five allegations: (1) the vehicle is equipped with a Totally Integrated Power Module ("TIPM"); (2) the vehicle's TIPM was defective when Plaintiffs purchased the vehicle; (3) FCA knew the TIPM was defective; (4) FCA concealed from Plaintiffs the fact that the TIPM was defective; and (5) Plaintiffs would not have purchased the vehicle if they had known that the TIPM was defective. See generally Doc. No. 1-1.

A TIPM is an electronic module located in numerous vehicles manufactured by FCA. See Doc. No. 62-1 at 3; Doc. No. 47-2 at 2. The TIPM serves as a power distribution system for the vehicle and includes relays, fuses, and printed circuit boards mounted in a protective case located in the engine compartment of the vehicle. See id.; Doc. No. 62-1 at 3. The location of the TIPM in the engine compartment varies from vehicle to vehicle. See Doc. No. 47-2 at 3. Each TIPM must be configured for the specific vehicle in which it is installed, and this is because TIPMs are

specific to each FCA-manufactured vehicle.  See id.  FCA did not equip 2013 Dodge Ram 1500 vehicles with TIPMs.  See id.

The complaint's allegations about the defective TIPM in Plaintiffs' vehicle are detailed and specific.  For example, rather than broadly alleging that the vehicle was equipped with defective "electrical system" or a defective "computer system" or a defective "power distribution system," the complaint specifically alleges that Plaintiffs' vehicle was equipped with a defective TIPM. The complaint makes at least 141 references to TIPMs.  Some of the allegations about the defective TIPM in Plaintiffs' vehicle and FCA's fraudulent concealment of the defective TIPM are as follows:

> ¶ 13.    The Subject Vehicle was factory-equipped with a Totally Integrated Power Module ("TIPM") which is located under the hood in the vehicle engine compartment.  FCA US LLC equipped the Subject Vehicle with a TIPM that FCA US LLC refers to as the "TIPM 7."

> ¶ 16.    The TIPM installed in the Subject Vehicle is defective and thus fails to reliably control and distribute power to various vehicle electrical systems and component parts.

> ¶ 17.    As a result of the TIPM defect, the Subject Vehicle has made irregular rattling and buzzing noises.

> ¶ 20.    FCA US LLC had superior and exclusive knowledge of the TIPM defects, and knew or should have known that the defects were not known by or reasonably discoverable by Plaintiffs before Plaintiffs purchased or leased the Subject Vehicle.

> ¶ 92.    FCA US LLC has never disclosed the TIPM defect to Plaintiffs prior to the purchase of the Subject Vehicle or at any point during ownership of the Subject Vehicle, and FCA US LLC has never instructed its dealerships to disclose the TIPM defect to drivers or potential purchasers or lessees of vehicles equipped with the TIPM-7.

> ¶ 93.    The TIPM defect was not known or reasonably discoverable by the Plaintiffs before purchase or lease, or without experiencing the defect first hand and exposing themselves to an unreasonable safety risk.

> ¶ 96.    As a result of FCA US LLC's inaction and silence, Plaintiffs were entirely unaware that Plaintiffs purchased, and continues to drive, unsafe and unreliable vehicles.  As FCA US LLC knows a reasonable person would consider the TIPM defect important and would not purchase or lease a vehicle equipped with the TIPM defect were the defect disclosed in advance, or would pay substantially less for the vehicle.

¶ 141. FCA US LLC concealed a known defect from Plaintiffs. The defective component is called the totally integrated power module (or TIPM).

¶ 143. FCA US LLC intentionally failed to disclose the known TIPM defect, which was known only to it.

¶ 145. Plaintiffs reasonably, justifiably, and detrimentally relied on FCA US LLC's silence about the TIPM defect when deciding whether to purchase or lease a vehicle equipped with a TIPM-7, in part because FCA US LLC was, and still is, in a position of superior knowledge about the TIPM defects.

¶ 158. FCA US LLC's concealment of the TIPM defect was a substantial factor in causing Plaintiffs' harm.

¶ 159. The concealment substantially influenced Plaintiffs to purchase to Subject Vehicle; Plaintiffs would not have purchased the Subject Vehicle had the TIPM defect been disclosed prior to sale.

Doc. No. 1-1.

During discovery, Plaintiffs and FCA retained automotive experts. Plaintiffs retained Darrell Blasjo and FCA retained Jeff Richards. In Richards' expert report, which is dated June 18, 2018, Richards opined that Plaintiffs' vehicle's problems and repairs were not related to the TIPM. See Doc. No. 47-13 at 7. When Richards was deposed on September 18, 2018, Richards testified that FCA did not equip 2013 Dodge Ram 1500 vehicles with TIPMs. See id. at 3. In Blasjo's expert report, which is dated June 26, 2018, Blasjo never opined that the vehicle was equipped with a TIPM, defective or otherwise, or that a TIPM was causing the problems with the vehicle. See Doc. No. 47-9. When Blasjo was deposed on June 29, 2018, Blasjo testified that the problems with the vehicle did not involve the TIPM. See Doc. No. 47-10 at 3.

On June 5, 2018, FCA served Plaintiffs with a Rule 68 offer to judgment in the amount of $40,000, plus attorney's fees. See Doc. No. 47-5 at 3; see also Doc. No. 62-1 at 3. Plaintiffs did not accept FCA's Rule 68 offer of judgment.

/ / /

On October 30, 2018, Plaintiffs filed an individual pretrial statement.  See Doc. No. 33.[3]
In the individual pretrial statement, Plaintiffs stated that they "request leave to file their First
Amended Complaint."  Doc. No. 33 at 13.  The individual pretrial statement stated nothing further
about amending the complaint, such as the proposed contents of the amended complaint, the legal
basis for amending the complaint, why the request was being made after the amendment deadline,
and whether Plaintiffs had discussed the requested amendment with FCA.

On February 4, 2019, Plaintiffs and FCA filed their joint pretrial statement.  See Doc. No.
40.  Just as Plaintiffs did in their prior individual pretrial statement, Plaintiffs stated in the joint
pretrial statement that they "request leave to file their First Amended Complaint."  Id. at 17.  And
just as Plaintiffs failed to do in their prior individual pretrial statement, Plaintiffs failed to say
anything meaningful in the joint pretrial statement about their request to amend the complaint.

On March 28, 2019, FCA filed the motion for partial summary judgment that is now before
the Court.  See Doc. No. 47.  As will be discussed in greater detail infra, the motion argued that
Plaintiffs could not prevail on their fraudulent concealment claim because Plaintiffs' vehicle was
never equipped with a TIPM.  Then, eleven days later, on April 8, 2019, Plaintiffs filed a motion
for leave to amend the complaint.  See Doc. No. 51.  In the motion for leave to amend, Plaintiffs
conceded that their vehicle was never equipped with a TIPM, but Plaintiffs asserted that they
"recently" learned that their vehicle was equipped with a defective PowerNet.  See id. at 6.  A
PowerNet is the electrical architecture installed in Plaintiffs' vehicle that controls virtually all of
the vehicle's electrical components, according to Plaintiffs' motion for leave to amend.  See Doc.
No. 51-2 at ¶ 22.  Plaintiffs asked the Court for leave to amend the complaint so that Plaintiffs
could allege that the defect with the vehicle was with the PowerNet, not the TIPM, and that FCA
fraudulently concealed the defective PowerNet from Plaintiffs.  See Doc. No. 51.

---

[3]  Plaintiffs' individual pretrial statement was filed in violation of Judge Ishii's case management procedures, which
require the parties to file a joint pretrial statement, not an individual pretrial statement.  See Case Management
Procedures "Standard Information," Senior United States District Judge Anthony W. Ishii,
http://www.caed.uscourts.gov/caednew/assets/File/Standard%20Information%20AWI%202019.pdf.  Consequently,
after Plaintiffs filed their individual pretrial statement, the Court ordered the parties to file a joint pretrial statement,
see Doc. No. 34, which the parties did.  See Doc. No. 40.

The Court denied Plaintiffs' motion for leave to amend because Plaintiffs failed to satisfy the "good cause" standard of Rule 16(b)(4). See Doc. No. 85 (citing Fed. R. Civ. P. 16(b)(4); Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 610 (9th Cir. 1992)). Consequently, Plaintiffs' original complaint remains the operative complaint in this lawsuit; and as previously discussed, the original complaint's fraudulent concealment claim is based on the allegation that Plaintiffs' vehicle is equipped with a defective TIPM.

### III. Legal Standard for Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. See Anderson, 477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. See Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 523 F.3d 915, 923-24 (9th Cir. 2008). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-

moving party would have the ultimate burden of persuasion." See Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party cannot "rest upon the mere allegations or denials of [its] pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (citations omitted).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Juell v. Forest Pharms., Inc., 456 F. Supp. 2d 1141, 1149 (E.D. Cal. 2006); UMG Recordings, Inc. v. Sinnott, 300 F. Supp. 2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see also Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). Further, a "motion for summary judgment may not be defeated . . . by evidence that is merely colorable or is not significantly probative." Anderson, 477 U.S. at 249-50 (citations omitted); Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). Additionally, the court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003). If the non-moving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine Ins. Co., 210 F.3d at 1103.

# IV.  FCA's Motion for Partial Summary Judgment

**A.     Fraudulent concealment claim.**

(1)     Parties' arguments.

FCA moves for summary judgment on Plaintiffs' fraudulent concealment claim, and FCA advances two arguments to do so.  First, Plaintiffs cannot prevail on the fraudulent concealment claim because the claim is premised on the allegation that Plaintiffs' vehicle is equipped with a defective TIPM, but it is now undisputed that the vehicle was never equipped with a TIPM. Second, Plaintiffs cannot prevail on the fraudulent concealment claim because the only harm Plaintiffs allegedly suffered from the fraudulent concealment is economic loss, and California's economic loss doctrine precludes recovery in tort when the plaintiff's damage consists solely of economic loss.

Plaintiffs now concede that their vehicle was never equipped with a TIPM, but Plaintiffs argue that summary judgment should be denied for four reasons.  First, the fraudulent concealment claim in Plaintiffs' proposed amended complaint — which Plaintiffs presented to the Court via Plaintiffs' motion for leave to amend the complaint — alleges that the vehicle is equipped with a defective PowerNet, and FCA fraudulently concealed the defective PowerNet from Plaintiffs. Therefore, assuming Plaintiffs' motion for leave to amend is granted, the fraudulent concealment claim is no longer premised on the false allegation that the vehicle is equipped with a defective TIPM but, instead, is premised on the allegation that the vehicle is equipped with a defective PowerNet.  Second, the difference between a PowerNet and TIPM is "simply an issue of a change in the nomenclature."  Doc. No. 62 at 16.  In making this second argument, Plaintiffs refer to the vehicle's defective system as the "TIPM/PowerNet," as if the two systems are the same.  See, e.g., id.  Third, evidence of the vehicle's defective "TIPM/PowerNet" was available to FCA during discovery.  Fourth, California's economic loss doctrine does not defeat Plaintiffs' fraudulent concealment claim.

(2)     Discussion.

A fraudulent concealment claim will fail if the defendant did not conceal or suppress a material fact from the plaintiff:

> The elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

Boschma v. Home Loan Ctr., Inc., 198 Cal. App. 4th 230, 248 (2011).

First and for purposes of clarity, the Court notes that Plaintiffs' motion for leave to amend the complaint was recently denied. See Doc. No. 85. Therefore, the Court rejects the arguments from Plaintiffs that assume that Plaintiffs' proposed amended complaint is the operative complaint. It is not. The operative complaint is Plaintiffs' original complaint.

According to Plaintiffs' operative complaint, the material fact that FCA concealed from Plaintiffs is that the vehicle is equipped with a defective TIPM. As previously stated, it is now undisputed that Plaintiffs' vehicle was never equipped with a TIPM and was never supposed to be equipped with a TIPM. See, e.g., Doc. No. 51 at 5 (Plaintiffs asserting that "[i]t has recently come to light that the defective component in the Subject Vehicle is not a TIPM as alleged in the original complaint"); Doc. No. 47-2 (FCA's automotive expert, Richards, declaring that 2013 Dodge Ram 1500 vehicles are not equipped with TIPMs). Therefore, Plaintiffs cannot prove several essential elements of their fraudulent concealment claim — including the element that FCA fraudulently concealed the defective TIPM from Plaintiffs; the element that Plaintiffs would have acted differently if they had known about the defective TIPM; and the element that Plaintiffs sustained damages because of the concealed defective TIPM. Accordingly, summary judgment in FCA's favor is warranted on Plaintiffs' fraudulent concealment claim. See James River Ins. Co., 523 F.3d at 923-24; Nissan Fire & Marine Ins. Co., 210 F.3d at 1102 ("In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact.").

The Court rejects Plaintiffs' assertions that the TIPM and PowerNet are the same and that the only difference between them is one of "nomenclature." See Doc. No. 62 at 16; Doc. No. 51 at

10

7.  Plaintiffs failed to support these assertions with admissible evidence.[4]  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (stating that admissibility at the summary judgment phase is determined by the evidence's contents, not the evidence's form); Orr v. Bank of Am., NT & SA,

---

[4]  In Plaintiffs' opposition, Plaintiffs make numerous factual assertions about the technical features of FCA-manufactured vehicles, including the TIPM and PowerNet.  For many of these assertions, Plaintiffs failed to cite to any evidence.  See, e.g., Doc. No. 62 at 16 (Plaintiffs asserting without supporting evidence that the vehicle's PowerNet electrical architecture is "merely a successor technology to the TIPM and suffers from the same recalls and technical service bulletins"); id. (Plaintiffs asserting without supporting evidence that "the difference in electrical architecture names [between the TIPM and PowerNet] is simply an issue of a change in the nomenclature").

Elsewhere in Plaintiffs' opposition, Plaintiffs assert that FCA's automotive expert, Richards, testified that the PowerNet replaced the TIPM.  See Doc. No. 62-1 ("Plaintiffs' Additional Meterial [sic] Facts and Evidence," No. 10).  To support this assertion, Plaintiffs cited to an excerpt of Richards' deposition testimony, ("Exhibit O (Deposition of Jeff Richards, pg. 23, ll. 16-19)"), but the deposition excerpt provided by Plaintiffs ("Exhibit O") does not support Plaintiffs' assertion.  See Doc. No. 62-17 ("Exhibit O").  Further, the deposition excerpt does not support Plaintiffs' assertion that the "PowerNet architecture is the successor the [sic] TIPM."  Doc. No. 62-1 ("Plaintiffs' Additional Meterial [sic] Facts and Evidence," No. 10).  In any event, even if it were true that FCA replaced the TIPM system with the PowerNet system, Plaintiffs' assertion that the PowerNet is the successor to the TIPM is not the same as, and does not support, Plaintiffs' assertion that the PowerNet and the TIPM are the same systems.

Plaintiffs also rely on the allegations in their proposed amended complaint as evidentiary support for Plaintiffs' assertions.  See, e.g., Doc. No. 62-1 at 15-16 ("Plaintiffs' Additional Meterial [sic] Facts and Evidence," Nos. 4-6) (citing to Plaintiffs' proposed amended complaint as evidentiary support for Plaintiffs' assertions about technical issues relating to FCA-manufactured vehicles, including Plaintiffs' vehicle, TIPM, and PowerNet).  Allegations in Plaintiffs' pleading and rejected proposed pleading do not provide evidentiary support.  See Curnow By & Through Curnow v. Ridgecrest Police, 952 F.2d 321, 324 (9th Cir. 1991) (stating that "mere pleadings" are insufficient to defeat a summary judgment motion).

Plaintiffs also rely on the declarations of their attorney, Kalinowski, and their corporate fraud expert, Barbara Luna, to support Plaintiffs' assertions about technical features of FCA-manufactured vehicles, including Plaintiffs' vehicle, TIPM, PowerNet, vehicle recalls, service bulletins, and the National Highway Traffic Safety Administration.  See, e.g., Doc. No. 62-1 at 15-16, 18-19 ("Plaintiffs' Additional Meterial [sic] Facts and Evidence," Nos. 4-6, 11, 14) (Plaintiffs making factual assertions about technical facets of FCA-manufactured vehicles, including Plaintiffs' vehicle, TIPM, and PowerNet, and Plaintiffs relying heavily for evidentiary support on Kalinoswki's declaration and Luna's deposition testimony and expert report).  There is no evidence before the Court demonstrating that Kalinoski and Luna are qualified to opine about such technical automotive matters and, in fact, the evidence suggests that they are not qualified.  See Fed. R. Evid. 702; Pyramid Techs., Inc. v. Hartford Cas. Ins. Co., 752 F.3d 807, 813 (9th Cir. 2014) (expert opinion is not admissible if the so-called "expert" is not qualified by knowledge, skill, experience, training, or education).  Plaintiffs' flawed reliance on Kalinowski and Luna for technical automotive opinions begs the question: If Plaintiffs' factual assertions about, for example, the TIPM and the PowerNet were true, then why did Plaintiffs not rely on their automotive expert, Blasjo, to provide evidentiary support for those assertions?

Finally, Plaintiffs also cite to "Exhibits 117-274" for evidentiary support.  See Doc. No. 62-1 at 16, 18 ("Plaintiffs' Additional Meterial [sic] Facts and Evidence Nos. 5, 11").  "Exhibits 117-274," which refer to Doc. Nos. 62-18 through 62-26, consists of over 100 pages of what appear to be technical automotive documents.  Plaintiffs failed to cite to any specific page or excerpt in "Exhibits 117-274."  The Court has briefly reviewed "Exhibits 117-274," but the Court is neither required nor inclined to parse through the voluminous documents in order to do what Plaintiffs' attorneys failed to do: identify and analyze specific evidentiary excerpts in order to support Plaintiffs' factual assertions.  See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003) ("A party opposing summary judgment must direct our attention to specific, triable facts.  General references without page or line numbers are not sufficiently specific."); Forsberg v. Pac. Northwest Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir.1988) ("The district judge is not required to comb the record to find some reason to deny a motion for summary judgment.").

285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). And in fact, the evidence before the Court actually indicates that the TIPM and the PowerNet are different systems. For example, the manager of product investigations for FCA, James Bielenda, declared that the TIPM and the PowerNet use different electronic control modules and different configurations for the communication network. See Doc. No. 65-3. And FCA's automotive expert, Richards, declared that the TIPM and the PowerNet are very different. See Doc. No. 47-2 at ¶ 9. Moreover, Plaintiffs clearly believe that the PowerNet is different from the TIPM system, at least to a significant degree: Plaintiffs attempted to amend their fraudulent concealment claim to allege that Plaintiffs' vehicle was equipped with a PowerNet, not a TIPM. See Doc. No. 51.

With respect to Plaintiffs' recent tactic of repeatedly calling the defective system the "TIPM/PowerNet" system, the Court considers this wordplay to be a disingenuous attempt at defeating summary judgment by muddying the factual waters. Prior to FCA's motion for summary judgment, Plaintiffs never referred to the defective system as the "TIPM/Powernet." Instead, Plaintiffs referred to the defective system as the TIPM. See Doc. No. 1-1 (Plaintiffs' complaint repeatedly referring to the TIPM but never referring to the PowerNet or the "TIPM/PowerNet"); Doc. No. 33-2 (Plaintiffs' individual pretrial statement exhibit list repeatedly referring to the TIPM but never referring to the PowerNet or the "TIPM/PowerNet").[5] Yet, in Plaintiffs' opposition to FCA's summary judgment motion, Plaintiffs repeatedly call the defective system the "TIPM/PowerNet" system. For example, Plaintiffs assert that (1) FCA "concealed a known defect(s) with the TIPM/Powernet module," Doc. No. 62 at 16; (2) Plaintiffs were "exposed to personal harm while driving the Subject Vehicle as a result of problems with the TIPM/Powernet architecture," id. at 23; (3) Plaintiffs' discovery responses provided FCA with sufficient "notice of the evidence of TIPM/Powernet defect problems," id. at 16; (4) FCA had "pre-sale knowledge of TIPM/Powernet defects," id. at 18; and (5) FCA had exclusive knowledge of TIPM/Powernet defects and concealed those from Plaintiffs." Id. Yet, despite Plaintiffs' recent

---

[5] It is true that Plaintiffs referred to the "TIPM/PowerNet" in Plaintiffs' motion for leave to amend, but the motion for leave to amend was filed only fourteen days before Plaintiffs filed their opposition to FCA's summary judgment motion. See Doc. No. 51.

and repeated use of the term "TIPM/PowerNet," it is undisputed that Plaintiffs' vehicle was never equipped with a TIPM, and there is no evidence that Plaintiffs' vehicle was equipped with a defective "TIPM/PowerNet," if such a thing even exists. Rather, the evidence before the Court is that the TIPM and the PowerNet are different systems — even if the PowerNet is the "successor" technology to the TIPM — and Plaintiffs' vehicle was equipped with the PowerNet. Thus, Plaintiffs' repeated use of the term "TIPM/PowerNet" is specious and unpersuasive.

With respect to Plaintiffs' contention that the evidence identified during discovery was sufficient to put FCA on notice about the defective PowerNet in Plaintiffs' vehicle, the Court finds this contention unavailing and off-target. The Court is adjudicating a summary judgment motion, not a discovery motion. This means that the question before the Court is whether Plaintiffs, in response to FCA's evidence, presented evidence to the Court showing a genuine issue of material fact with respect to Plaintiffs' fraudulent concealment claim. Plaintiffs have failed to do so, as discussed supra, regardless of whether Plaintiffs identified sufficient evidence during discovery. Also, the Court finds Plaintiffs' discovery argument to be self-defeating. If Plaintiffs sufficiently identified evidence during discovery that put FCA on notice about the defective PowerNet in Plaintiffs' vehicle, then why are Plaintiffs simultaneously arguing in their motion for leave to amend the complaint that Plaintiffs just "recently" discovered "new evidence" about the defective PowerNet, especially when discovery closed approximately eleven months ago? See Doc. No. 51 at 3 (Plaintiffs asserting in their motion for leave to amend that "Plaintiffs recently discovered new evidence that establishes Defendant's deliberate and fraudulent concealment of information regarding the electrical architecture present in several different models of Defendant's automobiles, including the Subject Vehicle" and "Plaintiffs could not have known about the problems with the PowerNet architecture prior to the performance of extensive research by Plaintiffs' counsel").

Finally, because the Court is granting summary judgment on the fraudulent concealment claim on grounds that Plaintiffs cannot prove essential elements of the claim, the Court declines to address FCA's alternative argument that the fraudulent concealment claim is barred by California's economic loss doctrine.

**B.      Punitive damages for fraudulent concealment.**

FCA moves for summary judgment on Plaintiffs' request for punitive damages.  According to FCA, Plaintiffs' request for punitive damages is premised only on Plaintiffs' fraudulent concealment claim, not on any of the other claims.  Therefore, according to FCA, if summary judgment is granted on the fraudulent concealment claim, then there remains no basis to award punitive damages.

The Court agrees.  Plaintiffs' complaint does not specify the basis for the requested punitive damages, but in Plaintiffs' individual pretrial statement and in the parties' joint pretrial statement, Plaintiffs specified that the requested punitive damages are based only on the fraudulent concealment claim.  See Doc. No. 33; Doc. No. 40.  Therefore, because the Court is granting summary judgment on the fraudulent concealment claim, summary judgment is inherently being granted on Plaintiffs' request for punitive damages.

**C.      Civil penalties for violation of Song-Beverly Act.**

(1)      Parties' arguments.

FCA moves for summary judgment on Plaintiffs' request for civil penalties for FCA's alleged violation of the Song-Beverly Act.  FCA argues that a vehicle manufacturer must "willfully" violate section 1973.2(d)(2) of the Song-Beverly Act in order for the plaintiff to be awarded civil penalties, and FCA did not willfully violate section 1973.2(d)(2) because FCA extended a Rule 68 offer of judgment to Plaintiffs.  In other words, according to FCA, a vehicle manufacturer's offer to pay restitution for a nonconforming vehicle bars a finding that the manufacturer willfully violated section 1973.2(d)(2), even if the manufacturer's offer of restitution is made after the purchaser initiated litigation against the manufacturer.

Plaintiffs argue that summary judgment on the request for civil penalties should be denied for two reasons.  First, a manufacturer's offer to pay restitution does not, as a matter of law, establish that the manufacturer did not willfully violate section 1973.2(d)(2).  In other words, FCA can be found to have willfully violated section 1973.2(d)(2) even if FCA offered to pay restitution to Plaintiffs.  Second, even if FCA did not willfully violate section 1973.2(d)(2), summary

judgment on Plaintiffs' request for civil penalties is inappropriate because there is a genuine issue of fact as to whether FCA maintained a qualified third-party dispute resolution process.

(2)    Discussion.

Plaintiffs assert that FCA violated the Song-Beverly Act because FCA breached the express warranty and then failed to promptly repair the vehicle or pay restitution.  On account of this alleged violation of the Song-Beverly Act, Plaintiffs requested civil penalties under the Song-Beverly Act in addition to actual damages.  See Doc. No. 1-1 at ¶ 128; Doc. No. 40 at 9; Doc. No. 62 at 12-15.

There are at least two different avenues for a purchaser of consumer goods to be awarded civil penalties under the Song-Beverly Act.  The first avenue is under section 1794(c), which allows the purchaser to be awarded civil penalties if the manufacturer or seller "willfully" violated a warranty, a service contract, or a provision of the Song-Beverly Act, such as section 1793.2(d)(2), which will be discussed infra.  See Cal. Civ. Code 1794(c); see also Jernigan v. Ford Motor Co., 24 Cal. App. 4th 488, 491–93 (1994).  The second avenue is under section 1794(e)(1)-(2), which allows the purchaser of a new vehicle to be awarded civil penalties if the following two conditions are met: (1) the vehicle manufacturer did not maintain a qualified third-party dispute resolution process that substantially complied with section 1793.22; and (2) the manufacturer violated section 1793.2(d)(2), which will be discussed infra.  Under this second avenue, the purchaser does not need to prove "willfulness" to be awarded civil penalties.

Here, in Plaintiffs' complaint and in the parties' joint pretrial statement, Plaintiffs requested civil penalties only under the "willful" avenue of section 1794(c), not under the "dispute resolution process" avenue of section 1794(e)(1)-(2).  See Doc. No. 1-1 ¶ 128 (Plaintiffs' complaint, wherein Plaintiffs request civil penalties for "willful" violation of the Song-Beverly Act); Doc. No. 40 at 9-10 (parties' joint pretrial statement, wherein Plaintiffs request civil penalties for "willful" violation of Song-Beverly Act).  Moreoever, according to Plaintiffs' briefing and the parties' joint pretrial statement, it appears that Plaintiffs are requesting civil penalties specifically for FCA's willful violation of section 1793.2(d)(2) of the Song-Beverly Act.

Section 1793.2(d)(2) requires vehicle manufacturers to promptly replace or pay restitution for their lemon vehicles. Section 1793.2(d)(2) reads as follows:

> If the manufacturer or its representative in [California] is unable to service or repair a new motor vehicle, as that term is defined in paragraph (2) of subdivision (e) of Section 1793.22, to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle in accordance with subparagraph (A) or promptly make restitution to the buyer in accordance with subparagraph (B). However, the buyer shall be free to elect restitution in lieu of replacement, and in no event shall the buyer be required by the manufacturer to accept a replacement vehicle.

Cal. Civ. Code § 1793.2(d)(2). The following scenario illustrates the elements of a claim for a manufacturer's violation of section 1793.2(d)(2): (1) the plaintiff purchased a new vehicle with a manufacturer's express warranty; (2) the vehicle did not conform to the express warranty; (3) the manufacturer or its representative could not service or repair the vehicle to conform to the express warranty after a "reasonable number" of attempts; and (4) the manufacturer then failed to "promptly" replace or pay restitution for the vehicle. See id.; see also Donlen v. Ford Motor Co., 217 Cal. App. 4th 138, 152 (2013); Judicial Council of California Civil Jury Instructions No. 3201 (2019).

A manufacturer's violation of section 1793.2(d)(2) is not willful if the manufacturer's "failure to replace or refund was the result of a good faith and reasonable belief the facts imposing the statutory obligation [under section 1793.2(d)(2) to promptly replace or pay restitution] were not present." Kwan v. Mercedes-Benz of North America, Inc., 23 Cal. App. 4th 174, 184 (1994). A manufacturer may be acting in "good faith and reasonable belief" when, for example, (1) the manufacturer reasonably believes the vehicle conformed to the warranty; (2) the manufacturer has not yet made a reasonable number of repair attempts on the vehicle; or (3) the purchaser desires further repair attempts rather than replacement or restitution. Id. at 185. Because the manufacture's "[s]ubjective good faith means a state of mind denoting honesty of purpose and freedom from intention to defraud or mislead," the question of whether the manufacturer acted in good faith "involves a factual inquiry into the [manufacturer's] subjective state of mind, a fact that rarely is susceptible to direct proof." Riley v. Ford Motor Co., 2017 WL 476619, at *12 (Cal. Ct.

16

App. Feb. 6, 2017) (quoting <u>People v. Accredited Surety Casualty Co.</u>, 230 Cal. App. 4th 548, 560 n.9 (2014)).  Consequently, to determine whether the manufacturer acted in "good faith and reasonable belief," the factfinder should examine "the circumstances that existed at the time of the action in question and draw[] inferences from those circumstances about the party's state of mind." <u>Riley</u>, 2017 WL 476619, at *12 (quoting <u>Accredited Surety Casualty Co.</u>, 230 Cal. App. 4th at 560 n.9).

Factfinders have considered multiple factors when determining whether the manufacturer willfully violated section 1793.2(d)(2).  Some of the factors are as follows:

(1)     Whether the manufacturer knew the vehicle was a lemon.  <u>See</u> <u>Lukather v. General Motors, LLC</u>, 181 Cal. App. 4th 1041, 1051-52 (2010).

(2)     Whether the manufacturer or its representative was provided with a reasonable period of time or reasonable number of attempts to repair the vehicle.  <u>See</u> <u>Jensen v. BMW of N. Am., Inc.</u>, 35 Cal. App. 4th 112, 136 (1995).

(3)     Whether the manufacturer knew the vehicle had not been repaired within a reasonable period of time or after a reasonable number of attempts.  <u>Id.</u>

(4)     The lengths the manufacturer or its representative went to to try to diagnose and repair the vehicle's problems.  <u>See</u> <u>Zubin v. Toyota Motor Sales, U.S.A., Inc.</u>, 2019 WL 1594463, at *23 (Cal. Ct. App. Apr. 15, 2019).

(5)     Whether the vehicle usually operated normally while in the shop for diagnosis and repair.  <u>See</u> <u>id.</u>

(6)     Whether the manufacturer had reasonable suspicions that the purchaser had tampered with the vehicle.  <u>See</u> <u>id.</u>

(7)     Whether the manufacturer had a written policy on the statutory requirement to repair or replace the vehicle.  <u>See</u> <u>Jensen</u>, 35 Cal. App. 4th at 136.

(8)     Whether the manufacturer knew the purchaser had requested replacement or restitution.  <u>See</u> <u>Lukather</u>, 181 Cal. App. 4th at 1052.

(9)     Whether the manufacturer actively discouraged the purchaser from requesting replacement or restitution.  <u>See</u> <u>id.</u> at 1051-52.

(10)     Whether the manufacturer relied on reasonably available and germane information when deciding whether to offer to replace or pay restitution.  <u>Kwan</u>, 23 Cal. App. 4th at 186.

(11)     Whether the purchaser made multiple unsuccessful requests for replacement or restitution.  <u>See</u> <u>Ruiz v. BMW of N. Am., LLC</u>, Case No. 2:16-cv-01177, 2018 WL 2106454, at *4 (C.D. Cal. May 7, 2018).

(12)     Whether the manufacturer's offer to pay restitution was a lowball offer or for an incorrect amount.  <u>See</u> <u>id.</u>

What is not a meaningful factor is whether the manufacturer knew of its obligations under section 1793.2(d)(2) to promptly replace or pay restitution.  This is because willfulness can exist even if the manufacturer did not know of its obligation under section 1793.2(d)(2).  <u>See</u> <u>Kwan</u>, 23 Cal. App. 4th at 186.  As the several foregoing factors suggest, the question of whether a manufacturer willfully violated section 1793.2(d)(2) is a factual question for the jury, as a general rule.  <u>See</u> <u>Oregel v. Am. Isuzu Motors, Inc.</u>, 90 Cal. App. 4th 1094, 1104 (2001); <u>Kwan</u>, 23 Cal. App. 4th at 186.

As previously stated, FCA argues that it did not willfully violate section 1793.2(d)(2) because FCA extended a Rule 68 offer of judgement to Plaintiffs in the amount of $40,000, plus attorney's fees.  According to FCA, if a manufacturer offers to pay restitution — even if the offer is extended after litigation commences — then the manufacturer cannot be found to have willfully violated section 1793.2(d)(2).  To support this argument, FCA cites primarily to <u>Hatami v. Kia Motors Am., Inc.</u>, a non-binding judicial decision from the Central District of California.  <u>Hatami</u>, Case No. 08-cv-0226, 2009 WL 1396358 (C.D. Cal. Apr. 20, 2009).  The Court will discuss <u>Hatami</u>, as well as other judicial decisions, to address and ultimately reject FCA's argument.

In <u>Hatami</u>, the plaintiff purchased a new vehicle in March 2006.  The vehicle experienced problems, so between March 2006 and November 2007, the plaintiff made five separate attempts to have the vehicle repaired.  Finally, in December 2007, the plaintiff demanded that the manufacturer pay restitution for the vehicle.  The manufacturer responded by offering to inspect and repair the vehicle.  Instead of responding to the manufacturer's offer to inspect and repair the

vehicle, the plaintiff filed suit against the manufacturer in February 2008 for willfully violating section 1793.2(d)(2).  In April 2008, which was before discovery commenced in the lawsuit, the manufacturer offered to pay restitution for the vehicle.  The plaintiff and manufacturer engaged in restitution negotiations, but ultimately the plaintiff rejected the manufacturer's final restitution offer.

At the summary judgment phase, the trial court ruled that there was a genuine issue of fact as to whether the manufacturer violated section 1793.2(d)(2) because a factfinder could find that the manufacturer's restitution offer was not made "promptly," as is required by section 1793.2(d)(2).  But as for whether the manufacturer <u>willfully</u> violated section 1793.2(d)(2), the court ruled that summary judgment in the manufacturer's favor was warranted because the following three facts established a lack of willfulness: (1) the manufacturer responded to the plaintiff's original restitution demand by offering to inspect and repair the vehicle; (2) the manufacturer made multiple restitution offers to the plaintiff; and (3) the manufacturer's restitution offers were made after the lawsuit was filed, as opposed to before the lawsuit was filed, because the manufacturer wanted to be sure that the vehicle was truly nonconforming and warranted restitution.  <u>Id.</u> at *5.

There are at least two significant distinctions between the facts in <u>Hatami</u> and the facts here.  First, whereas in <u>Hatami</u> the manufacturer offered to inspect and repair the vehicle immediately after the plaintiff's original restitution demand, here there is no evidence that FCA offered to inspect and repair Plaintiffs' vehicle shortly after Mr. Ramos called FCA and requested restitution on April 9, 2016.  It is true that FCA could try to downplay this distinction by asserting that Plaintiffs were not in possession of the vehicle (due to the repossession) when Plaintiffs' originally requested restitution, which potentially could have affected FCA's ability to inspect and repair the vehicle.  The parties have not addressed whether FCA had access to the vehicle after the vehicle was repossessed.  But regardless, FCA cannot downplay the second distinction, which is that whereas in <u>Hatami</u> the manufacturer offered to pay restitution for the vehicle approximately five months after the plaintiff originally demanded restitution and before discovery commenced, here FCA did not make the Rule 68 offer of judgment until twenty-six months after Plaintiffs

made their original restitution demand, fourteen months after Plaintiffs filed suit, and several
months after discovery commenced.

These distinctions are important because the crucial question is whether FCA's decision to
not pay restitution <u>during the twenty-six months between Plaintiffs' original restitution request
and FCA's eventual offer of judgment</u> was based on FCA's good faith and reasonable belief that
FCA was not required to promptly pay restitution, as is required by section 1793.2(d)(2).  <u>See</u>
<u>Kwan</u>, 23 Cal. App. 4th at 184.  Based on the available facts at this summary judgment phase, a
reasonable factfinder could infer an absence of good faith and reasonable belief on FCA's part due
to the fact that FCA's offer of judgment was made so long after Plaintiffs' original restitution
request.  Further, unlike the facts in <u>Hatami</u>, here FCA has failed to provide an explanation for
why it waited twenty-six months to extend the offer of judgment.  For these reasons, <u>Hatami</u> does
not persuade the Court to conclude that there is no genuine issue of fact as to whether FCA
willfully violated section 1793.2(d)(2).

Similarly, <u>Valenzuela v. FCA US LLC</u> and <u>Boyzo v. FCA US LLC</u> fail to persuade the
Court that summary judgment is warranted.  <u>See Base v. FCA US LLC</u>, Case No. 17-cv-01532,
2019 WL 1117532 (N.D. Cal. Mar. 11, 2019) (consolidated with <u>Valenzuela</u> and <u>Boyzo</u>).  In both
<u>Valenzuela</u> and <u>Boyzo</u>, the plaintiff purchased a new vehicle that experienced problems.  The
plaintiff unsuccessfully attempted to have the vehicle repaired on five separate occasions.  The
plaintiff then filed suit against the manufacturer, requesting civil penalties for the manufacturer's
willful violation of section 1793.2(d)(2).  Before the plaintiff filed suit, the plaintiff never
requested replacement or restitution from the manufacturer.  Then, approximately four months
after the plaintiff filed suit, the manufacturer served the plaintiff with an offer of compromise.

At the summary judgment phase, the trial court in <u>Valenzuela</u> and <u>Boyzo</u> ruled that
summary judgment in the manufacture's favor was warranted as to the plaintiff's request for civil
penalties.  The court made this ruling because it could not find evidence demonstrating that the
manufacturer intentionally avoided its obligations under section 1793.2(d)(2) to promptly offer to
replace the vehicle or pay restitution.

There are two significant distinctions between the facts here and the facts in <u>Valenzuela</u> and <u>Boyzo</u>. First, whereas the plaintiffs in <u>Valenzuela</u> and <u>Boyzo</u> filed suit against the manufacturer before requesting replacement or restitution, here Plaintiffs requested restitution from FCA almost twelve months before filing suit. Second, whereas the manufacture in <u>Valenzuela</u> and <u>Boyzo</u> made offers of compromise approximately four months after the plaintiffs filed suit, here FCA waited approximately fourteen months after litigation commenced to extend the Rule 68 offer of judgment. These distinctions are important because Plaintiffs' request for restitution placed FCA on notice that FCA may be obligated under section 1793.2(d)(2) to promptly replace the vehicle or pay restitution. But FCA waited approximately twenty-six months to extend the Rule 68 offer of judgment, and the evidence at this summary judgment phase does not conclusively prove that FCA's prolonged delay was due to FCA's "good faith and reasonable belief." Therefore, because of these significant factual distinctions, <u>Valenzuela</u> and <u>Boyzo</u> do not persuade the Court to conclude that there is no genuine issue of fact as to whether FCA willfully violated section 1793.2(d)(2).

Similarly, <u>Dominguez v. Am. Suzuki Motor Corp.</u>, 160 Cal. App. 4th 53 (2008), does not persuade the Court to conclude that summary judgment is warranted. In <u>Dominguez</u>, the plaintiff purchased a new motorcycle in November 2004. During the next six months, the plaintiff took the motorcycle to be repaired on five separate occasions. Then, in June 2005, the plaintiff requested replacement of the motorcycle or restitution because, according to the plaintiff, there was an alleged problem with the motorcycle. One week later, the manufacturer responded to the request, asking that the plaintiff bring the motorcycle in to be inspected and repaired. The manufacturer also stated that the repair mechanics in the past had never been able to duplicate the plaintiff's alleged problem with the motorcycle, had observed excessive mileage on the motorcycle, which indicated that there was not a recurrent problem, and noted that the plaintiff had previously brought the motorcycle in for repairs unrelated to the alleged problem. In July 2005, the manufacturer offered to pay restitution in an effort to resolve the matter. In August 2005, the manufacture extended another restitution offer. In September 2005, the manufacture reiterated the

terms of the restitution offer from August 2005.  The plaintiff then filed suit against the manufacturer for willfully violating section 1793.2(d)(1).[6]

At the summary judgment phase, the trial court ruled that the manufacturer violated section 1793.2(d)(1).  But on appeal, the appellate court ruled that the manufacturer did not willfully violate section 1793.2(d)(1).  According to the appellate court, there was no evidence of willfulness because, in part, there was a span of only six weeks between the plaintiff's original demand and the manufacturer's original offer to pay restitution.

Unlike the manufacturer in Dominguez, here FCA waited until approximately twenty-six months from Plaintiffs' original request for restitution to extend the Rule 68 offer of judgment.  And as previously stated, this lengthy delay could allow a reasonable factfinder to infer an absence of good faith and reasonable belief on FCA's part.  For example, based on the evidence at this summary judgment phase, a reasonable factfinder could infer that FCA's lengthy delay in extending the offer of judgment was due to FCA's negligence, indifference, or deliberate attempt to discourage Plaintiffs from seeking and receiving restitution.  See, e.g., Lukather, 181 Cal. App. 4th at 1052 (standing for the proposition that a manufacturer who is under an obligation to promptly replace or pay restitution but who nonetheless discourages the purchaser from seeking replacement or restitution can be found to have willfully violated section 1793.2(d)(2)).

Ultimately, the foregoing analysis of cases illustrates an important consideration when determining whether a manufacturer willfully violated section 1793.2(d)(2).  That consideration is as follows: To what extent and under what circumstances did the manufacturer wait to extend the offer of replacement or restitution?  To be clear, this consideration is not to be confused with the question of whether the manufacturer "promptly" complied with its obligations under section 1793.2(d)(2), although the two are factually related.  The extent to and the circumstances under which the manufacturer waited to make an offer of replacement or restitution can be very

---

[6] Section 1932.2(d)(2) does not apply to motorcycles, which are not considered "new motor vehicles" under California's Tanner Consumer Protection Act, which is embedded within the Song-Beverly Act.  However, motorcycles are covered by Section 1932.2(d)(1), which is very similar to Section 1932.2(d)(2) in that both provisions require the manufacturer to offer to replace the nonconforming vehicle or pay restitution.

1  indicative of whether the manufacture acted in "good faith and reasonable belief" to comply with
2  its obligations under section 1793.2(d)(2). The following hypothetical illustrates this point.

3      A dealership for a sophisticated and international vehicle manufacturer sells a new vehicle
4  to a purchaser. The purchaser is of average or below-average means and sophistication. The
5  purchaser discovers that the vehicle has problems. The purchaser repeatedly but unsuccessfully
6  attempts to have the vehicle repaired. The purchaser requests replacement or restitution. The
7  manufacture learns that the vehicle is nonconforming to the express warranty, and the manufacture
8  becomes subject to the obligation of section 1793.2(d)(2). But despite the obligation to promptly
9  offer replacement or restitution, the manufacturer deliberately decides that it will test the waters,
10 so to speak, and see whether the purchaser is truly committed to obtaining a replacement or
11 restitution. For example, before offering a replacement or restitution, the manufacturer
12 deliberately waits to see if the purchaser will initiate litigation. Or, if the purchaser does initiate
13 litigation, the manufacturer waits even longer to see how zealous and effective the purchaser is
14 during litigation before offering a replacement or restitution.

15     This hypothetical, which is well within the pale of possibility, illustrates a manufacture's
16 calculated and intentional attempt to thin the heard: to those purchasers who are truly committed
17 and eventually initiate zealous litigation, the manufacturer reluctantly offers replacement or
18 restitution; but to those impotent purchasers who do not pursue litigation, the manufacture
19 withholds replacement and restitution. If a manufacturer operated on this or a similar basis, then
20 the manufacturer could be found to have acted in bad faith, <u>even if the manufacturer eventually</u>
21 <u>offers replacement or restitution</u>. This could be especially true if the manufacturer has a history or
22 policy of operating on this basis. <u>See</u> <u>Jensen</u>, 35 Cal. App. 4th 136 (illustrating that one of the
23 factors of willfulness is whether the manufacturer had a written policy on the requirement to
24 replace or pay restitution).

25     The Court is not suggesting that the above hypothetical is reflective of FCA's conduct in
26 this case. But at this summary judgment phase, the evidence does not establish that FCA did not
27 act like the manufacturer in the hypothetical or, alternatively, did not act negligently or
28 indifferently during the twenty-six months prior to extending the offer of judgment. Therefore,

because this issue of material fact remains unresolved, the question must proceed to trial, where the factfinder will likely ask, "Why did FCA wait approximately twenty-six months to offer restitution to the Plaintiffs?"

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.     FCA's motion for partial summary judgment (Doc. No. 47) is GRANTED IN PART and DENIED IN PART, as follows:

       a.    Summary judgment is GRANTED in favor of FCA on Plaintiffs' fraudulent inducement-concealment claim and Plaintiffs' request for punitive damages for fraudulent inducement-concealment;

       b.    Summary judgment is DENIED on Plaintiffs' request for civil penalties for willful violation of the Song-Beverly Act.

IT IS SO ORDERED.

Dated:   May 15, 2019          _____

                   SENIOR  DISTRICT  JUDGE